[No. G036470. Fourth Dist., Div. Three. June 18, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSHUA WEYLAND BRENN, Defendant and Appellant.

─────────────────────

**COUNSEL**

Carmela F. Simoncini, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Gary W. Schons, Assistant Attorneys General, Scott C. Taylor and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

─────────────────────

**OPINION**

**BEDSWORTH, J.**—We deal here with the admissibility of statements made by a stabbing victim to a 911 operator and the first police officer on the scene. It is our conclusion the statements were admissible as spontaneous statements and were nontestimonial in nature, and therefore not barred by *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*).

\* \* \*

In February 2004, appellant was staying at a group home for people with mental health and/or substance abuse problems. The residents were referred to the home by the county mental health agency, but it was an independent living facility, with no live-in supervision. Although the home was for men only, that did not bother appellant and his girlfriend, Valerie White, nor were they concerned that there was a protective order in place prohibiting appellant from having contact with White: They lived together at the home from February 10 thru February 18.

On the 18th, the house more resembled a frat house than a halfway house. Its occupants were drinking alcohol, smoking marijuana and watching pornographic movies. Around 7:30 p.m., the party mood turned sour when appell-

ant and White got into a heated argument. Appellant was yelling at White and pulling her hair when Ronnie Zupsic intervened on her behalf. Zupsic and appellant then began to fight each other. After going at it for awhile, they broke it off and went to different areas of the house.

That was not the end of it, though. Before long, appellant walked out through the kitchen area and confronted Zupsic in the living room. He mentioned something about Zupsic calling the police and then stabbed him in the stomach with a foot-long kitchen knife.

Zupsic left the house and somehow made it next door where he called 911. The tape of the call was played to the jury and is discussed in detail below. Zupsic told the operator about the stabbing, and she dispatched emergency personnel to the scene. Police Officer Brent Taylor was the first to arrive. After arresting appellant outside the group home, he went inside the neighbor's house and contacted Zupsic, who was just finishing up the 911 call. Zupsic appeared shocked, confused and in pain. Taylor questioned him briefly, and he said he had been stabbed next door. The paramedics then arrived and took him to the hospital, where he underwent surgery. Zupsic survived but did not testify at trial.

The parties stipulated that about an hour after the stabbing, appellant's blood-alcohol level was .10 percent. Defense Expert Darrel Clardy opined that it would have been even higher at the time of the stabbing and that drinking to such levels would likely impair one's cognitive functioning.

In closing argument, appellant's attorney argued self-defense, imperfect self-defense, heat of passion and diminished capacity. He obtained some measure of success: The jury acquitted appellant of attempted murder and instead found him guilty of the lesser included offense of attempted voluntary manslaughter. It also convicted him of assault with a deadly weapon, domestic violence battery and violating a protective order. And it found true allegations that appellant personally used a deadly weapon and inflicted great bodily injury. The court sentenced him to seven years in prison.

Appellant contends: (1) the court erred in admitting the victim's hearsay statements; (2) double jeopardy principles barred his prosecution and punishment for violating a protective order; (3) the statute prohibiting violation of a protective order is overbroad; and (4) his sentence for assault should be stayed. His last contention has merit, as the Attorney General admits, and therefore we will modify appellant's sentence accordingly. In all other respects, we affirm the judgment.

## I

Appellant first challenges the trial court's decision to admit the tape of the 911 call and the statements Zupsic made to Officer Taylor after the call. He contends this evidence was inadmissible hearsay, and that its introduction violated his Sixth Amendment confrontation rights for reasons explained in *Crawford*. We disagree with both contentions and find the evidence was properly admitted.

Before trial, the prosecution filed a written motion to admit the challenged evidence.[1] The prosecutor claimed: (1) The statements fell within the spontaneous declaration exception to the hearsay rule; and (2) they were outside the scope of *Crawford* because they were nontestimonial.

At the motion hearing, the court listened to the 911 tape. At the outset of the call, Zupsic said he had just been stabbed in the stomach and gave the dispatcher his first name and the address of the group home. The dispatcher asked him "who did this to you?" and Zupsic answered, "It was Joshua (appellant), I don't know his last name, he lives at my place [where] I'm staying for mentally ill people [unintelligible]. He uh, he was attacking his girlfriend; grabbing her by the hair. I tried . . . stopping it, he . . . uh . . . he grabbed me from my throat . . . [¶] . . . [¶] . . . and uh . . . [¶] . . . [¶] . . . I defended myself."

At that point in the call, the dispatcher put Zupsic on hold and contacted the paramedics. The dispatcher then told Zupsic to keep her informed of his condition and said help was on the way. She asked Zupsic when he last saw Joshua and he said, "In the house," in the "mentally ill facility." In response to further questioning, Zupsic said Joshua was mentally ill. He said he did not know if Joshua still had the knife, because he "took off out of the house" after he was stabbed. Zupsic then explained he was at a neighbor's house, and not where the stabbing occurred. He added, "I've just been stabbed . . . [¶] . . . [¶] So, I'm like in shock."

The dispatcher asked if Joshua was still next door, and Zupsic said he was there with his girlfriend and several others. Asked if Joshua had any other weapons, Zupsic answered, "I don't know. Okay, he just said [unintelligible], you're gonna call the cops on me, I said, yup." The dispatcher then obtained Zupsic's full name and his phone number and told him officers had arrived at the scene. She said, "Our officers need to find out if they need to go in or not and assess the situation further, okay?"

---

[1] The prosecution also sought to admit statements Zupsic made to the police while he was at the hospital. However, the trial court denied that request, so we need not get into those statements.

Zupsic replied, "Right, he stabbed me, I want to press charges." At the dispatcher's request, he then provided a description of Joshua. Getting back to the stabbing, he said Joshua "was grabbing his girlfriend by the head so I stood up . . . ." The dispatcher told Zupsic to stay put until the officers contacted him, to which Zupsic replied, "Okay. He stabbed me, I don't know why. Cause I [unintelligible] threatened to call the cops on him, he said you're gonna call the cops on me and he goes I'm going to stab you." Moments later, Officer Taylor contacted Zupsic and the call ended.

Taylor testified he was there "to check on the medical condition of the victims and look for suspects." He said he only had time to ask Zupsic a few questions before the paramedics arrived. Zupsic seemed befuddled and in agony, saying only that someone had stabbed him next door with a kitchen knife.

In seeking to exclude Zupsic's statements, defense counsel argued they were unreliable because Zupsic was agitated, anxious and confused and because he lived in a home for the mentally ill. The prosecutor countered that the excitement of the situation actually worked to ensure Zupsic's statements were reliable. The prosecutor also represented that since the stabbing, Zupsic's mental state "has deteriorated to a point where he is very delusional now" and "there is an issue of whether or not he would even be competent to testify at this point due to the degradation of his mental faculties, either his failure to take medication or a combination of his ongoing degenerative problem." The court construed this as an offer of proof that Zupsic was unable to testify. The prosecutor confirmed this, saying Zupsic "is not capable of testifying now a year and a half later due to degradation obviously in his mental condition." Appellant did not dispute this, and nothing further was said about the issue. The court ruled Zupsic's statements (1) qualified for admission under the spontaneous declaration exception to the hearsay rule, and (2) were not barred by the *Crawford* decision.

██ Evidence Code section 1240 provides, "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." " 'The foundation for this exception [to the hearsay rule] is that if the declarations are made under the immediate influence of the occurrence to which they relate, they are deemed sufficiently trustworthy to be presented to the jury. [Citation.] [¶] The basis for this circumstantial probability of trustworthiness is "that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief." ' [Citation.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318

[246 Cal.Rptr. 886, 753 P.2d 1082].) Because the inquiry into whether a statement qualifies as a spontaneous declaration is factually driven, we will not disturb the trial court's ruling on this issue unless there has been a demonstrable abuse of discretion. (*Ibid.*)

■ The record shows that after being stabbed, Zupsic "took off" out of the group home and went next door to call 911. By all estimates, he was talking to the 911 dispatcher within minutes of the stabbing. And his statements during the call (and later to Officer Taylor) clearly related to the stabbing. True, many of his statements were made in response to questioning, which is a factor militating against spontaneity. (See *People v. Pirwani* (2004) 119 Cal.App.4th 770, 789 [14 Cal.Rptr.3d 673].) But that factor is not dispositive. (*Ibid.*) It readily appears that some of Zupsic's answers were fragmented, and others were nonresponsive, indicating a clear lack of deliberation and measured thoughtfulness. Indeed, at one point, he blurted out, "I've just been stabbed" "[s]o like I'm in shock." Appellant takes this to mean Zupsic was so disconnected from reality that his statements could not be trusted. But in this regard the questioning of Zupsic undermines appellant's argument because, despite the shock and pain from the stabbing, Zupsic was still able to answer most of the dispatcher's questions and follow her directions. He wandered a bit in some of his responses, but that's what people tend to do when they are agitated and excited in the wake of a traumatic event, such as being stabbed. His conversation with the dispatcher indicates his hold on reality, while imperiled, was still firm.

Appellant argues Zupsic's statements were unreliable because he was living in the group home and unable to testify at trial. But the record is devoid of evidence showing that Zupsic's mental condition was disabling at the time of the stabbing. His statements to the dispatcher and Officer Taylor, although somewhat scattered at times, were generally coherent. And, as noted, they were made close in time to the stabbing. Because it appears they were made under the stress of excitement of the stabbing and while Zupsic's reflective powers were still in abeyance, we cannot say the trial court abused its discretion in finding they qualified as spontaneous declarations under Evidence Code section 1240. (See *People v. Corella* (2004) 122 Cal.App.4th 461, 466 [18 Cal.Rptr.3d 770] [victim's statements to 911 dispatcher about domestic abuse incident admissible as spontaneous declarations].)

## II

Having determined Zupsic's statements were admissible under state law, we now turn to appellant's claim their introduction violated his right of confrontation under the Sixth Amendment, as interpreted by the United States Supreme Court in *Crawford.* As a preliminary matter, the Attorney General

claims appellant waived his right to challenge the statements under *Crawford* because he did not expressly invoke that decision as a ground for excluding them in the trial court. But we find that was not required because the prosecution put the *Crawford* issue on the table in its pretrial motion. The whole idea behind the objection requirement is to afford the proponent of the evidence an opportunity to establish its admissibility and assist the court in making an informed decision. (See *People v. Williams* (1988) 44 Cal.3d 883, 906 [245 Cal.Rptr. 336, 751 P.2d 395].) Those goals were met here when the prosecution addressed the *Crawford* issue in its pretrial motion, and the court addressed the issue in rendering its decision.

Therefore, even though appellant is not the one who first brought up the *Crawford* case, no unfairness or impropriety will result from our consideration of that decision. (Cf. *People v. Williams, supra*, 44 Cal.3d at p. 907 [defense counsel's failure to specify grounds for objection did not preclude appellate review of evidentiary issue where prosecutor's opening statement made clear the purpose for which the evidence was to be introduced]; cf. *People v. Alvarez* (1996) 14 Cal.4th 155, 186 [58 Cal.Rptr.2d 385, 926 P.2d 365] [although the court found defendant waived his right to raise confrontation issue on appeal, the circumstances of the case indicated that neither party brought the issue to the trial court's attention and therefore the court never considered it]; *People v. Chaney* (2007) 148 Cal.App.4th 772 [56 Cal.Rptr.3d 128] [same].)

■ In *Crawford*, the United States Supreme Court determined the Sixth Amendment right of confrontation precludes the introduction of "testimonial" hearsay unless the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine him. (*Crawford, supra*, 541 U.S. at pp. 53–54, 68.) The statements at issue in *Crawford* were clearly testimonial, having been made and recorded during a formal police interrogation. (*Id.* at pp. 52–53, 68.) Therefore, the court had no occasion to refine the somewhat ambiguous term "testimonial." (*Ibid.*)

However, in *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*), the high court was called upon to do just that. The statements at issue there were made to a 911 operator by Michelle McCottry as she was being attacked by her former boyfriend. In response to the operator's questions, McCottry reported her assailant's name, the nature of the abuse and where it was occurring. As the call progressed, she also informed the operator that her assailant had just run out the door and was leaving in a car. (*Id.* at pp. 817–818 [126 S.Ct. at p. 2271].)

■ In deciding whether McCottry's statements were testimonial, the Supreme Court explained, "Statements are nontestimonial when made in the

course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra,* 547 U.S. at p. 822 [126 S.Ct. at pp. 2273–2274], fn. omitted.)

■ The *Davis* court noted that while the interrogation in *Crawford* was "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator," "the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (*Davis, supra,* 547 U.S. at pp. 826–827 [126 S.Ct. at p. 2276]; accord, *People v. Cooper* (2007) 148 Cal.App.4th 731, 742 [56 Cal.Rptr.3d 6] ["Interrogation during a 911 call is not testimonial."].)

Contrasting *Crawford* further, the *Davis* court explained, "McCottry was speaking about events *as they were actually happening,* rather than 'describ[ing] past events,' [citation]. Sylvia Crawford's interrogation, on the other hand, took place hours after the events she described had occurred. Moreover, any reasonable listener would recognize that McCottry (unlike Sylvia Crawford) was facing an ongoing emergency. Although one *might* call 911 to provide a narrative report of a crime absent any imminent danger, McCottry's call was plainly a call for help against a bona fide physical threat. Third, the nature of what [McCottry] was asked and answered . . . was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. [Citation.] And finally, the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." (*Davis, supra,* 547 U.S. at p. 827 [126 S.Ct. at pp. 2276–2277].)

On the basis of these distinctions, the Supreme Court determined McCottry's statements were nontestimonial because the "primary purpose" of her 911 call "was to enable police assistance to meet an ongoing emergency. She simply was not acting as a *witness;* she was not *testifying*. What she said

was not 'a weaker substitute for live testimony' at trial . . . ." (*Davis, supra,* 547 U.S. at p. 828 [126 S.Ct. at p. 2277].)[2]

The California Supreme Court recently provided its own take on *Davis* in *People v. Cage* (2007) 40 Cal.4th 965 [56 Cal.Rptr.3d 789, 155 P.3d 205] (*Cage*). Factually, *Cage* is inapposite here, having involved statements the victim made *after* he was taken to the hospital. (See *id.* at pp. 984–991 [finding statements made to police officer testimonial and statements made to doctor nontestimonial].) However, *Cage* is instructive because it sets forth what our Supreme Court considers to be the "basic principles" that are applicable in considering a confrontation issue in the wake of *Davis.* (*Id.* at p. 984.)

█ The *Cage* court explained, "First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Cage, supra,* 40 Cal.4th at p. 984, fns. omitted.)

Applying these factors to the case at hand, we conclude Zupsic's statements during the 911 call and his subsequent statements to Officer Taylor were nontestimonial in nature. To begin with, the purpose and form of the statements were not the functional equivalents of trial testimony. During the 911 call, Zupsic made his statements in response to rapid-fire questioning

---

[2] In a companion case to *Davis, Hammon v. Indiana,* the Supreme Court reiterated its analysis with respect to statements the victim made in a written affidavit to police officers who were investigating a domestic disturbance that had already run its course by the time the officers arrived on the scene. (See *Davis, supra,* 547 U.S. at pp. 829–830 [126 S.Ct. at p. 2278].) Finding the statements comparable to those at issue in *Crawford,* the court determined they were testimonial because they were derived from an investigation aimed at finding out " 'what happened,' " as opposed to " 'what is happening.' " (*Id.* at p. 830.)

from the dispatcher. There was nothing formal, solemn or structured about the colloquy. And unlike a criminal prosecutor, the dispatcher was primarily concerned with what was happening at the moment, as opposed to what had happened in the past. The dispatcher was eliciting information in an attempt to assess the present situation and help Zupsic and the responding officers, not secure a conviction in a court of law.

At one point during the call, Zupsic did say he wanted to "press charges." But it does not appear that his *primary purpose* during the call was to establish past facts for use in a criminal trial, or that the 911 operator was concerned about that issue. Again, *Cage* is instructive. Our Supreme Court emphasized there that "the proper focus is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial. Instead, we are concerned with statements, made with some formality, which, *viewed objectively*, are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial." (*Cage, supra*, 40 Cal.4th at p. 984, fn. 14.)

Much of the information Zupsic provided to the 911 dispatcher pertained to who and where he was, what he was calling about, where the suspect was located, what the suspect looked like, and what he might be expected to do. Background information of this sort would be expected of anyone calling the police during an emergency situation. It is not typically grist for a prosecutor's closing argument.

Appellant questions whether Zupsic was facing an emergency at all, given that he had gone next door to call the police. This is an argument much easier to make from a law office than from 100 feet from someone who has just stabbed you. At the time of the call, Zupsic was suffering from a fresh stab wound, appellant was still at large, and it was unclear whether he still had any weapons or was searching for Zupsic. It was known—as is clear from Zupsic's statements—that appellant was "mentally ill" and had attacked his girlfriend in conjunction with the stabbing episode. It is hard to construct a definition of the word "emergency" that this scenario does not fit.

Moreover, there can be little doubt the information Zupsic provided was important in terms of helping the police formulate an appropriate response to the situation. It does not appear the information was elicited or provided for the primary purpose of making a case against appellant at trial. And we cannot see any material difference between the information and that imparted by Ms. McCottry in the *Davis* case. For all these reasons, we find that the 911 tape was nontestimonial. (See *People v. Corella, supra*, 122 Cal.App.4th at p. 468 [in finding victim's 911 call nontestimonial, court notes

911 operators are typically geared toward determining the appropriate response to a caller in need and "not conducting a police interrogation in contemplation of future prosecution"].)[3]

### III

■ We reach the same conclusion with respect to the statements Zupsic made to Officer Taylor. Taylor had but a few moments with Zupsic before the paramedics arrived, and during this brief period of time he was only able to ask Zupsic a few general questions about what was going on. He was there to assist Zupsic, not to prepare for trial. As one court has observed, "Preliminary questions asked at the scene of a crime shortly after it has occurred do not rise to the level of an 'interrogation.' Such an unstructured interaction between officer and witness bears no resemblance to a formal or informal police inquiry that is required for a police 'interrogation' as that term is used in *Crawford*. [Citations.]" (*People v. Corella, supra,* 122 Cal.App.4th at p. 469.) Because of the informality, brevity and unstructured nature of the exchange between Zupsic and Officer Taylor, we find Zupsic's statements to the officer were nontestimonial. Therefore, they were outside the scope of *Crawford*.

### IV

Even assuming, arguendo, that introduction of the challenged statements violated appellant's confrontation rights, we are convinced any such violation was harmless beyond a reasonable doubt. (See generally *Cage, supra,* 40 Cal.4th at pp. 991–994 [finding erroneous admission of testimonial hearsay harmless beyond a reasonable doubt].) Appellant argues the statements were prejudicial because they adversely affected his claim of self-defense and bolstered the prosecution's claim he intended to kill Zupsic, but we cannot agree.

Zupsic's statement appellant grabbed him by the throat, forcing him to take defensive action, did cut against appellant's claim of self-defense. However, the evidence at trial clearly demonstrated appellant was the initial aggressor in the fight between him and Zupsic. Appellant's own girlfriend, White, testified appellant confronted Zupsic, and not vice versa. And witness Jose Calderon testified that when Zupsic intervened on White's behalf, appellant "got belligerent" and hit Zupsic.

---

[3] It is true, as appellant points out, that people sometimes call 911 "to falsely report a crime in order to elude arrest and prosecution for [their] own unlawful" conduct. But it is obvious Zupsic was not in this small class of callers. Our conclusion about Zupsic's call is limited to the facts and circumstances surrounding genuine emergencies.

Furthermore, witness David Kramer testified that just before the stabbing occurred, appellant told Zupsic "I give up" and acted like he was leaving. In response to this, Zupsic signaled that he too wanted to end the fighting. However, appellant then spun around and stabbed Zupsic while he was off guard.

On these facts, appellant's self-defense theory never had a chance. The evidence established he was in no apparent danger at the time of the stabbing, and he was the one who started the fray in the first place. Zupsic's statements added nothing new in this regard and cannot be fairly described as having had a determinative effect on the failure of appellant's self-defense theory.

Zupsic's statements regarding appellant's motive for the stabbing were similarly superfluous. Zupsic told the 911 dispatcher that appellant stabbed him because he had threatened to call the police. However, that motive was revealed at trial by means other than the Zupsic's statements. Calderon testified that after the initial altercation between appellant and Zupsic, appellant came out through the kitchen area and confronted Zupsic. According to Calderon, he told Zupsic " 'You're going to call the cops on me, huh?' " and then immediately stabbed Zupsic in the stomach. This sequence of events, never contradicted, left little room for doubt that appellant stabbed Zupsic because he found convincing Zupsic's statement he was going to call the police.

Nor was there any shortage of evidence establishing appellant's intent to kill. Zupsic came to White's aid while appellant was abusing her; appellant and Zupsic squared off in a violent quarrel; and in the midst of all this animosity, appellant stabbed Zupsic in the gut with a long-bladed kitchen knife. Standing alone, these circumstances readily support the jury's conclusion appellant intended to kill Zupsic. We are thus convinced any error in admitting Zupsic's statements into evidence was harmless beyond a reasonable doubt.

V

Appellant was also convicted of violating a protective order issued in July 2003, as a condition of his probation in *People v. Brenn* (Super. Ct. Orange County, 2003, No. 03NM08804) (case No. 03NM08804). Appellant does not dispute his contact with White violated the order. However, he claims his conviction and punishment were barred by double jeopardy principles because the violation also formed the basis for his probation revocation in case No. 03NM08804. In other words, appellant contends he was punished twice for but one transgression: violating the protective order.

Appellant has failed to prove this is what occurred. His probation report in this case states, "The defendant is currently on five grants of probation, three from Orange County [including case No. 03NM08804] and two from Riverside County. The defendant violated probation on the three Orange County grants as a result of the instant offense and [was] sentenced on same on July 1 and 28, 2005." However, this does not prove that appellant's probation was revoked *because he violated the protective order.* Assuming his probation was subject to the universal condition that he "obey all laws," his probation could have been revoked simply because of what he did to Zupsic.

Appellant insists proof of his claim is contained in various court documents in case No. 03NM08804 that we have—at appellant's request—judicially noticed. Indeed, he alleges, "Those documents show unambiguously that probation was revoked and [he] has been sentenced upon the revocation of probation *for violating the protective order*." (Italics added.) To the contrary, none of the documents even *mention* the protective order. A minute order from July 1, 2005, shows appellant's probation was revoked that day, but it does not indicate *why* it was revoked.

As the Attorney General rightly notes, the only basis alleged in the documents for revoking appellant's probation is that he failed to enroll in an anger management program. Suffice it to say, appellant has not proven the factual predicate of his double jeopardy claim: that he was punished twice—once by having his probation revoked on a past case, and once by being convicted and sentenced in the present case—for the single act of violating the protective order. (Cf. *People v. Johnson* (1993) 20 Cal.App.4th 106 [24 Cal.Rptr.2d 628] [defendant could not be convicted of contempt of court for violating protective order where such contempt was the sole and undisputed basis for revoking his probation in an earlier case].)

## VI

Appellant also challenges the statute under which he was convicted for violating the protective order, Penal Code section 166.[4] He argues the statute is overbroad and violates due process because theoretically it can be applied when the person protected by an order initiates contact with the defendant and the defendant merely acquiesces to the contact. We need not decide this issue because such a factual predicate is not before us.

---

[4] More specifically, subdivision (c)(1) of that section, which provides, "any willful and knowing violation of any protective order or stay away court order issued . . . in a pending criminal proceeding involving domestic violence . . . or issued as a condition of probation after a conviction in a criminal proceeding involving domestic violence . . . or that is an order described in paragraph (3), shall constitute contempt of court . . . ." (Pen. Code, § 166, subd. (c)(1).)

Certainly, we can envision circumstances in which the person protected by an order seeks out the defendant and the defendant neither intends, nor does anything, to facilitate contact with that person, yet contact still occurs. But such contact, being neither willful nor knowing on the part of the defendant, would not be a violation of the statute. If this defense were precluded, *then* appellant might have a constitutional argument.

But in this case, appellant was not an "innocent violator" of the order prohibiting him from having contact with White. White's testimony makes that clear. She said she was appellant's girlfriend from 2001 to 2004 and was actually engaged to him at the time of the stabbing. She was aware of the 2003 protective order, but did not request it. On February 10, 2004, she arrived in Orange County via bus from her home in Northern California. Appellant was the one who met her at the bus station, and he was the one who drove her to the group home. They lived together there for over a week, until the stabbing occurred on the 18th. There is no evidence White or appellant did anything with regard to the protective order during this time, although White testified she intended to "get rid of it."

These facts do not describe the factual premise of appellant's argument that he lacked criminal intent and did nothing to facilitate his contact with White. Surely, he intended to contact White: He picked her up at the bus station and took her home with him. In so doing, he clearly committed an affirmative act in furtherance of his intent. If that weren't enough, he lived with White for eight days after her initial arrival. This is more than mere acquiescence to contact with an unwanted visitor. It is, rather clearly, willful and knowing disregard of the existing no-contact order, which is precisely what the statute prescribes. Accordingly, we will not entertain appellant's argument that Penal Code section 166, subdivision (c)(1) might be unconstitutional under circumstances not presented in this case.

## VII

With respect to count 2, aggravated assault with a great bodily injury enhancement, the court gave appellant a six-year term and ordered it to run concurrently with his sentence for attempted manslaughter in count 1. However, the court also stayed count 2 pursuant to Penal Code section 654. As the Attorney General concedes, the court cannot order a sentence to run concurrently and invoke Penal Code section 654 at the same time. When, as here, that section applies, the appropriate action is to impose a term for the subject offense and order it stayed. (*People v. Deloza* (1998) 18 Cal.4th 585, 591–592 [76 Cal.Rptr.2d 255, 957 P.2d 945].)

## DISPOSITION

Appellant's six-year sentence in count 2 for aggravated assault with a great bodily injury enhancement is ordered stayed pursuant to Penal Code section 654. In all other respects, the judgment is affirmed.

Sills, P. J., and Aronson, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 10, 2007, S154801.