Filed 2/25/16  P. v. Mora CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SOCORRO MORA,<br><br>    Defendant and Appellant. | 2d Crim. No. B259116<br>(Super. Ct. No. KA095882<br>(Los Angeles County) |

Socorro Mora appeals a judgment following conviction of second degree murder, infliction of cruelty to an animal, and infliction of corporal injury to a spouse, with a finding that she personally used a deadly weapon in committing the murder.  (Pen. Code, §§ 187, subd. (a), 189, 597, subd. (a), 273.5, subd. (a), 12022, subd. (b)(1).)[1]  We modify the judgment regarding the ownership, use, or possession of any weapon, but otherwise affirm.

### FACTUAL AND PROCEDURAL HISTORY

Socorro and George Mora were married and had four children.[2]  The couple and their children lived together in a home in Walnut along with the children's pet dog, "Snowflake."  George, an accountant, was employed by a forensic accounting firm;

---

[1] All statutory references are to the Penal Code unless stated otherwise.

[2] We will refer to family members by their first name, not from disrespect but to ease the reader's task.

Kathy Hernandez, the office manager of the accounting firm, answered George's office telephone.

In 2006, Socorro telephoned George at his office as often as eight times daily. In 2008 and 2009, Socorro questioned Hernandez regarding George's coworker, April Baker. George informed Hernandez that Socorro mistakenly believed that he was romantically involved with Baker. Hernandez was friendly with Baker, knew Baker's boyfriend, and did not believe that George and Baker had a romantic relationship.

In 2010, Socorro telephoned Hernandez, disguised her voice, and requested Baker's personal contact information. Hernandez refused to provide the information. Eventually, Socorro obtained Baker's telephone number. In 2011, the Moras' daughter Lauren viewed her mother's cellular telephone history and saw that Socorro had called Baker's telephone number many times.

By the summer of 2011, Socorro was telephoning George five to ten times daily. George informed Hernandez that he was frightened of Socorro and that she "was making his life hell" in her belief that he was involved with Baker. George stated that Socorro frequently was enraged and angry; she threw household items at him and was "very physical with him sometimes." He also stated that she followed him in her vehicle. George displayed threatening text messages that Socorro sent him, threatening to "cut [his] balls off" with a knife that she had sharpened.

The Moras' children frequently called or texted Socorro's sister, Melissa Bugarin, when they became frightened of Socorro's behavior. The Moras' daughter Juliana texted Bugarin on September 6, 2011, and stated that Socorro was striking and scratching George but that he was not retaliating.

The children also saw text messages or heard voicemails from Socorro threatening George. Lauren twice heard Socorro threaten to kill George with a knife. At times when Socorro was striking George, the children would stand in front of him to block Socorro's blows.

In 2011, George displayed a text message to Bugarin that he had received from Socorro. The message read: "I'm going to cut your balls off . . . and send them to

2

. . . April Baker."  George stated to Bugarin that he did not physically retaliate against Socorro because, if he were arrested, he would not "be there for the kids."  George also informed his brothers of Socorro's threatening behavior and described an incident where she had released insects inside his vehicle.

By September 13, 2011, Socorro lived in a separate room in the family home.  The room housed the children's toys and family members referred to it as "the toy room."  That evening, son Matthew asked George to retrieve a toy from the room because he feared his mother.  When George went into the room, Socorro pushed him to the floor and scratched him on his arms until his arms bled.  She then scratched her own arms and called for help.  George stood nearby, "[t]rying to figure out what to do."  Lauren and Juliana contacted Bugarin for assistance.  Police officers soon arrived at the family home. (Count 3 [infliction of corporal abuse on a spouse].)

Following the assault in the children's toy room, George telephoned Bugarin several times and stated that he and the children feared Socorro.  On one occasion, Bugarin contacted George to warn him that Socorro had taken garden shears from her brother's home; Bugarin warned George "to be careful."

In September 2011, George obtained a restraining order against Socorro, requiring her to move from the family home.  Socorro also obtained a restraining order against George, claiming that he had abused her.  Pending Socorro's move from the family home, George and the children lived with George's brother.

On September 24, 2011, George and the children returned to the family home.  Inside, they found broken china and partially destroyed photographs.  More importantly, Snowflake lay dead in a flower bed in the backyard.  She had puncture wounds to her chest; a wet knife lay in the kitchen sink.  The children were upset by their dog's death; George became frightened and stated that he was "next."  Bugarin recommended that George hide the kitchen knives.  (Count 2 [infliction of cruelty to an animal].)

After Socorro moved from the family home, she continued to telephone George frequently and leave messages.  She also followed him after he drove the children

3

to school each day.  At some point, she returned to the family home.  Bugarin stayed at the home for a night and kept a written diary of the evening's events.  Bugarin testified that Socorro paced around the house, laughed "a very evil laugh," started arguments, and complained to the police of harassment.

At the end of September 2011, George's employer dismissed him from employment due to Socorro's disruptive behavior.

By October 2011, George and Socorro were involved in dissolution proceedings.  On October 5, 2011, George served Socorro with a restraining order.  George and the children were then staying with his brother Miguel.  Socorro eventually left the family home and George changed the door locks.

On October 16, 2011, Socorro attended a yard sale held by a longtime acquaintance, Leslie Cristman.  Cristman mentioned that he had a handgun for sale for $300, and Socorro asked to see it.  More than once, Socorro stated that she needed a gun because she "want[ed] to fuckin' kill [her husband]."  She stated that she and her husband were divorcing, he was abusing her, and he did not permit her to visit her children.  Socorro stated that she needed the weapon by Wednesday, October 19, 2011.  When she examined the handgun, Socorro stated that it fit her hand well and "it was what she needed."  Cristman had second thoughts, however, about selling the handgun to Socorro.  He advised her that it would be necessary for her to complete paperwork and to wait a 10- to 15-day waiting period before purchasing the gun.  Socorro replied that she "needed [the gun] by Wednesday [October 19, 2011]" and that "she'd find something else."

On October 18, 2011, the evening before George's murder, Socorro telephoned him approximately 20 times and demanded money or else "bad things were gonna happen."  The following morning, Bugarin warned George not to return home after driving the children to school because Socorro had her brother's garden shears.

Between 8:00 a.m. and 9:00 a.m. on October 19, 2011, Los Angeles sheriff's deputies arrived at the Mora home in response to a 911 emergency call placed by Socorro.  She sat on a bench in front of the home and was bleeding from knife wounds.  A bloody filet knife lay on the ground near her right foot and a bloody glove lay nearby.

4

A deputy applied first-aid to her arm wound. Paramedics soon arrived, rendered aid to Socorro, and took her to a hospital for treatment and surgery. Socorro suffered from a serious abdominal wound and a serious wound to her right arm, among 20 knife wounds to her body.

Inside the home, deputies found George's body lying on the kitchen floor. Deputy Lines photographed the body – George was lying face down with his left arm under the left side of his chest. A knife lay across George's right wrist.

Deputies found a blood trail leading from the kitchen to outside the house. Inside the kitchen, a blood trail lay underneath two toppled kitchen chairs. Deputies found four knives in the kitchen or frontyard, three of which were bloodstained. They also found bloody shoeprints leading away from the kitchen. In their opinion, the shoeprints matched the bottoms of the Socorro's shoes which were "saturated" with blood.

Deputies found that the French doors of the home, opening to the backyard, had been pried open and the doorjamb shattered. A screen door also had been forcibly removed. A screwdriver and two claw-hammers lay near the doors.

Deputies later found Socorro's vehicle parked in a parking lot one-quarter mile away from the Mora family home.

Deputies recovered a file from George's office computer, the "Soco file," memorializing Socorro's behavior with George and the children. They also recovered a printed copy of the computer file from George's briefcase.

A criminalist examined the DNA evidence obtained from the knives and clothing taken from the crime scene. The DNA on the tip of the filet knife found by Socorro's foot matched that of Socorro. The DNA from a bloody serrated kitchen knife had two contributors – George, a major contributor, and Socorro, a minor contributor. The DNA from a bent kitchen knife had two contributors – George, a minor contributor, and Socorro, a major contributor. Many bloodstained clothing items taken from scene also contained the DNA of George and Socorro.

A pathologist performed an autopsy on George's body and found that he suffered a fatal six-inch knife wound to his heart. The pathologist also found that George suffered 31 serious or superficial knife wounds, some defensive and some likely inflicted after the fatal heart wound. In the pathologist's opinion, a defensive wound to George's small finger was consistent with an injury that could be caused by attempting to seize a knife from an assailant.

Paul Delhauer, a retired homicide investigator for the Los Angeles Sheriff's Department, testified as a crime scene reconstruction expert. He opined that George's defensive hand injuries indicate that he was not armed with a knife when he suffered those injuries. Delhauer believed that many of George's superficial knife wounds were inflicted after he was disabled and lying on the kitchen floor. He also opined that many of Socorro's wounds were consistent with self-inflicted wounds or wounds inflicted by accident. Delhauer opined that the only reasonable explanation for the placement of the serrated knife on the back of George's wrist was placement by Socorro.

*Conviction and Sentencing*

The jury convicted Socorro of second degree murder, infliction of cruelty to an animal, and infliction of corporal injury to a spouse. (§§ 187, subd. (a), 189, 597, subd. (a), 273.5, subd. (a).) It also found that Socorro personally used a deadly weapon in committing the murder. (§ 12022, subd. (b)(1).) The trial court sentenced her to an indeterminate term of 16 years to life for the murder, a consecutive four-year term for infliction of corporal injury on a spouse, and a consecutive eight-month term for infliction of cruelty to an animal, for a total sentence of 20 years 8 months. The court also imposed a $10,000 restitution fine, a $10,000 parole revocation restitution fine (stayed), a $120 court security assessment, and a $90 criminal conviction assessment; ordered victim restitution; and awarded Socorro 1,057 days of presentence custody credit. (§§ 1202.4, subd. (b), 1202.45, 1465.8, subd. (a); Gov. Code, § 70373.)

Socorro appeals and contends that the trial court erred by: 1) instructing that the jury could not consider the statements in her emergency police call for their truth, 2) refusing to instruct regarding voluntary manslaughter arising from a sudden quarrel or

6

heat of passion, and 3) imposing a restriction against the ownership, use, or possession of any weapon.

*DISCUSSION*

*I.*

Socorro argues that the trial court erred by instructing that her statement to the 911 emergency dispatcher could not be considered for its truth. During the 911 call, Socorro stated that she stabbed her husband after he attacked her. Socorro contends that the statement is admissible as an excited utterance exception to the hearsay rule. (Evid. Code, § 1240; *People v. Brenn* (2007) 152 Cal.App.4th 166, 171-173 [stabbing victim telephoned 911 dispatcher within minutes of stabbing; victim's statement admissible as excited utterance].) She asserts that the trial court's ruling denied her constitutional right to present a defense pursuant to the federal and state constitutions. Socorro claims that the error is prejudicial pursuant to any standard of review.

Evidence Code section 1240 permits evidence of a spontaneous statement that explains or describes an event perceived by the declarant, and that was made spontaneously while the declarant was under the stress of excitement caused by the perception. To apply this exception to the hearsay rule, the trial court must determine that 1) there was an occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; 2) the utterance must have been made before there has been time to contrive and misrepresent; and 3) the utterance must relate to the circumstance of the occurrence. (*People v. Lucas* (2014) 60 Cal.4th 153, 269, overruled on other grounds by *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.) "[T]he mental state of the declarant – that is, the question of whether he or she was sufficiently under stress so as to dramatically reduce the possibility of deliberation and prevarication – is crucial to determining whether the exception applies." (*Id.* at pp. 269-270.) On review, we determine whether the court abused its discretion by denying admission of the statement as an excited utterance. (*Id.* at p. 270.)

The trial court did not abuse its discretion by ruling that Socorro's 911 statement was self-serving, hearsay, and not an excited utterance. Sufficient evidence

7

supports the court's implied ruling that Socorro's call was contrived and made after she had time to reflect. Socorro had a history of threats and violence toward George, attempted to purchase a firearm several days prior to George's murder, and broke into the family home where she encountered George. The crime scene also appeared to have been staged, with overturned chairs and other objects. Socorro presented no evidence at trial implying that she made the 911 call pursuant to the requirements of Evidence Code section 1240, particularly the necessity of an unreflecting mental state. Socorro's statement thus fails the second requirement of the excited utterance exception, i.e., that the utterance must have been made in an unreflecting state of mind.

## II.

Socorro contends that the trial court erred by refusing her instructions regarding voluntary manslaughter resting upon a theory of sudden quarrel or heat of passion. (CALJIC Nos. 8.40 [defining voluntary manslaughter], 8.42 [defining a sudden quarrel or heat of passion and provocation].) She asserts that substantial evidence supports the instruction, pointing to evidence that George stated that he intended to fight for custody of his children, she thought he had an affair with April Baker, she was restrained from living at the family home and was without funds, and he did not return her telephone calls. Socorro asserts that the jury had no alternative except first degree or second degree murder and, therefore, the error is reversible pursuant to *Chapman v. California* (1967) 386 U.S. 18.

The trial court must instruct on all lesser included offenses supported by substantial evidence. (*People v. Duff* (2014) 58 Cal.4th 527, 561.) The duty applies whenever there is evidence from which a reasonable jury could conclude that the defendant is guilty of the lesser, but not the greater, offense. (*Ibid.*) Conversely, even on request, there is no duty to instruct on any lesser offense unless there is substantial evidence to support the instruction. (*People v. Avila* (2009) 46 Cal.4th 680, 705.) On appeal, we independently review whether the trial court erred by not instructing regarding a lesser included offense. (*Ibid.*)

8

Voluntary manslaughter is a lesser included offense of murder. (§ 192, subd. (a) [voluntary manslaughter is the unlawful killing of a human being "upon a sudden quarrel or heat of passion"]; *People v. Elmore* (2014) 59 Cal.4th 121, 133.) Voluntary manslaughter, resting upon a heat-of-passion theory, arises when the defendant is provoked by acts that would render an ordinary person of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment. (*People v. Duff*, *supra*, 58 Cal.4th 527, 562.) The defendant must also kill while under the influence of such passion. (*Ibid.*) Provocation thus distinguishes heat-of-passion manslaughter from murder. (*People v. Avila*, *supra*, 46 Cal.4th 680, 705.) "'[T]he victim must taunt the defendant or otherwise initiate the provocation.'" (*Ibid.*)

The trial court properly refused to instruct regarding voluntary manslaughter because there is insufficient evidence that George provoked Socorro to act from a heat of passion. Circumstantial evidence of Socorro's mental state implies that her actions were deliberate and calculated; she breached the French doors leading to the backyard, stabbed George 31 times, including after his death, staged the kitchen to make it appear that a fight had occurred, and then stabbed herself either accidentally or intentionally after George's death. The position of the serrated knife on the back of George's wrist suggests that Socorro planted it in that position.

There is also insufficient evidence of provocation by George because there is no evidence of what George did or said when he encountered Socorro in the family home. Indeed, the evidence suggests that George endured Socorro's relentless telephone calls and physical attacks in order to protect his children and provide them with a stable parent. There is also no evidence that George was involved in a relationship with April Baker; the evidence was to the contrary. (*People v. Cole* (2004) 33 Cal.4th 1158, 1216 [insufficient evidence to warrant heat-of-passion manslaughter instruction where defendant and victim argued frequently and "bickering, yelling, and cursing were the norm"].)

9

Moreover, there is no fundamental unfairness to a defendant from a lack of instruction on a criminal offense that is unsupported by evidence upon which a reasonable jury can rely. (*People v. Avila*, *supra*, 46 Cal.4th 680, 707.) Here the jury received instruction regarding first and second degree murder and had a choice in evaluating Socorro's culpability. (*Ibid.*)

*III.*

Socorro contends that the trial court imposed an unauthorized sentence when, during the oral pronouncement of judgment, it ordered that she "may not own, use or possess any deadly or dangerous weapons, including firearms." She points out that section 29800 prohibits a convicted felon from owning, possessing, or controlling a firearm, but not other weapons. The Attorney General agrees that section 29800 is so limited. In the interest of judicial economy, we modify the order to strike "any deadly or dangerous weapons" and limit the order to firearms only. (§ 29800.) The abstract of judgment already reflects this limitation when it states, "Firearms Prohibited."

The judgment is otherwise affirmed.

NOT TO BE PUBLISHED.


GILBERT, P.J.

We concur:


YEGAN, J.


PERREN, J.


10

Bruce F. Marrs, Judge

Superior Court County of Los Angeles

_____

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Idan Ivri, Deputy Attorney General, for Plaintiff and Respondent.