Filed 8/14/20  P. v. Farrow CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072184 |
| v. | |
| O.D. FARROW, JR., | (Super.Ct.No. RIF1704311) |
| Defendant and Appellant. | OPINION |

APPEAL from the Superior Court of Riverside County. Thomas D. Glasser, Judge. Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Allison V. Acosta and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted O.D. Farrow of one count of making criminal threats after hearing evidence he chased his girlfriend through the streets of Moreno Valley, drove his car into the passenger side of her car, and threatened to kill her and her children. On appeal, he argues the trial court violated his Sixth Amendment confrontation right by allowing the jury to hear two 911 calls, which he argues were testimonial in nature, regarding prior uncharged acts of domestic violence. He also argues the court violated his due process rights as articulated in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) by imposing various fines and fees without determining his ability to pay.

We affirm. As we explain below, Farrow's *Dueñas* claim lacks merit and the admission of the challenged 911 calls did not violate his Sixth Amendment right to confrontation because the calls were not testimonial. Rather, they took place during an ongoing emergency in which the callers sought assistance and the police sought to prevent further violence.

## I

## FACTS

The prosecution tried Farrow on two charges, assault with a deadly weapon other than a firearm and making criminal threats. The victim, Jane Doe, who had been in an off-and-on relationship with Farrow for a few years, proved to be an uncooperative witness at trial. As occurs unfortunately all too often in domestic violence cases, Doe claimed not to remember the incident or any other prior domestic violence incidents involving Farrow. She admitted she was afraid of him, but told the jury she still loved

him "very much."[1] To convey the details of the incident to the jury and prove Farrow's guilt, the prosecution relied on Doe's panicked phone call to her sister during the incident, her statements to the police, and evidence of prior acts of domestic violence Farrow had committed.

A.    *The Incident*

Shortly before 5:00 a.m. on December 17, 2016, Doe was driving from her home in Moreno Valley when she noticed Farrow driving in the opposite direction. They made eye contact and Farrow turned around and started following her. Doe was afraid of him because he had abused her before and she knew he was violent. She sped and turned down different streets in an effort to lose him. But when she finally came to a stop at an intersection, he pulled up next to her and started yelling and threatening to kill her. He drove his car into the passenger side of her car and told her to go to his house or else he would kill her and her children.

Terrified, Doe called her sister for help and tried to describe her location. Her sister could hear her screaming Farrow's name and telling him to stop. She immediately called 911 and reported Doe's situation. At trial, Doe's sister said she was afraid that was the last time she would hear Doe's voice because she knew Farrow was violent.

A Riverside County deputy sheriff responded to the call and interviewed Doe at her home. She described what had happened with Farrow and was shaking and upset. She told the deputy she was afraid of Farrow because he had two prior strike convictions and

---

[1] Doe also admitted she was an unwilling witness and had been ignoring subpoenas because she didn't want to testify.

had abused her before. She showed the deputy the dents in her car from Farrow running into it. During his investigation, the deputy found camera footage from Moreno Valley intersections showing Farrow's car pursuing Doe's.

B.  *Prior Uncharged Incidents of Domestic Violence*

The prosecution presented evidence of five previous incidents of Farrow engaging in domestic violence against women he was either dating or married to—specifically, a 2006 incident during which he repeatedly punched and threatened to kill his then wife, two incidents from 2007 during which he physically abused a different wife (now ex-wife), a 2014 incident where he hit and choked Doe, and a 2015 incident where he abused Doe in a car while he was driving. For the 2015 and one of the 2007 incidents, the prosecution played for the jury the 911 calls that are the subject of this appeal.

One call was from July 2007 and came from Farrow's then wife. She told the 911 operator she had "just" escaped Farrow's house and ran next door to get help. She said Farrow had been keeping her hostage and beating her. The operator asked multiple times if she needed a paramedic and she said no. She said her nose and lip were bleeding and her eyes were so swollen she could hardly see. She said Farrow had also dislocated her shoulder but she had been able to put it back into place. The operator asked if Farrow had ever hit her before and she said he had, to the point where her mother had gotten a restraining order against him. She told the operator she was sure Farrow had left his house once he realized she had escaped. As the operator asked questions about her location and the location of Farrow's house, she told the operator she thought she just

4

saw Farrow drive by in his friend's car. She asked the operator what was taking the police so long to arrive. She was worried Farrow was out there looking for her and she didn't want to jeopardize the neighbor's safety.

The parties stipulated that this incident resulted in a felony domestic violence conviction against Farrow.

The other call was from March 2015 from a woman who witnessed Farrow abusing Doe as he was driving. The caller told the operator, "I just seen someone [kick] someone—a woman out of his car and he's driving away. He was grabbing her by her hair." She said the man "was dragging her by her hair [when] she was out [of] the car" and the woman was going to need a paramedic. The operator asked questions to determine the caller's location, the type of car Farrow was driving, and which direction he went. At trial, Doe admitted she had ended up in the hospital and needed a neck brace because of this incident, though she claimed not to remember the details. The prosecution showed the jury photos of her injuries and played the audio of an interview she gave to law enforcement at the hospital. During the interview Doe said she and Farrow had gotten into an argument while driving and he had punched her multiple times in the head and jaw. She had tried to jump out of the car but he grabbed her by the hair and continued driving. She kept her foot out of the car door in the hope someone would see her and call for help.

C.     *Verdict and Sentencing*

The jury found Farrow guilty of making criminal threats but not guilty of assault. The court sentenced him to a total of 11 years in prison, consisting of six years for the current conviction (the upper term of three years doubled for a prior strike conviction) plus a consecutive term of five years for a prior serious felony enhancement. The court imposed a $3,300 restitution fine, a $40 court operations assessment, and a $30 conviction assessment, and Farrow did not object.

**II**

**ANALYSIS**

A.     *Sixth Amendment*

Farrow asserts a single ground for reversing his criminal threats conviction. He argues the trial court violated his Sixth Amendment confrontation right by playing the 911 calls from his ex-wife and the caller who witnessed the March 2015 incident without allowing him the opportunity to cross-examine these women. We conclude the calls were not testimonial and therefore did not implicate Farrow's confrontation rights. The Sixth Amendment's confrontation clause guarantees criminal defendants "the right . . . to be confronted with the witnesses against [them]." (U.S. Const., 6th Amend.) In *Crawford v. Washington* (2004) 541 U.S. 36, the United States Supreme Court held that the confrontation clause prohibits the admission of out-of-court statements that are "testimonial" in nature if the declarant does not appear at trial for cross-examination. (*Id.* at pp. 54, 59; *People v. Thomas* (2011) 51 Cal.4th 449, 496.) Thus, if the statement is not

6

testimonial, it is subject only to state hearsay laws, and does not implicate the confrontation clause.**2** (*Crawford*, at p. 68; see also *Davis v. Washington* (2006) 547 U.S. 813, 821 (*Davis*).)

In *Davis*, the United States Supreme Court considered when statements made to the police are testimonial. It held that statements are nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." (*Davis*, *supra*, 547 U.S. at p. 822.) In contrast, statements to the police are testimonial "when the circumstances objectively indicate that *there is no such ongoing emergency*, and that the primary purpose of the interrogation is to establish or *prove past events potentially relevant to later criminal prosecution*." (*Ibid.*, italics added.) To determine the primary purpose of police interrogation, courts must "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." (*Michigan v. Bryant* (2011) 562 U.S. 344, 359.) "*Davis* requires a combined inquiry that accounts for both the declarant and the interrogator." (*Id.* at p. 367.)

*People v. Brenn* (2007) 152 Cal.App.4th 166 (*Brenn*) is instructive. In that case, the victim and the defendant lived in the same house and, during the course of an argument, the defendant stabbed the victim in the stomach with a "foot-long kitchen knife." (*Id.* at p. 170.) The victim left the house and made it next door where he called

---

**2** The right to confrontation is "not absolute," however. (*People v. Thomas*, *supra*, 51 Cal.4th at p. 499.) There is an exception, not applicable here, for out-of-court statements by a declarant who is unavailable to testify, as long as the defendant had a prior opportunity to cross-examine them.

911. (*Ibid.*) He described the argument and the stabbing in detail, and the operator dispatched emergency personnel to the scene. (*Ibid.*) During the call, the victim answered the operator's questions about the defendant's location, his mental health, and whether he still had the knife. (*Id.* at pp. 170-171.) The court held the victim's statements were not testimonial because their form and purpose were not "the functional equivalents of trial testimony." (*Id.* at p. 176.) The court noted the statements were made in "response to rapid-fire questioning from the dispatcher." (*Ibid.*) "There was nothing formal, solemn or structured about the colloquy. And unlike a criminal prosecutor, the dispatcher was primarily concerned with what was happening at the moment, as opposed to what had happened in the past. The dispatcher was eliciting information in an attempt to assess the present situation and help [the victim] and the responding officers, not secure a conviction in a court of law." (*Id.* at pp. 176-177.) In short, the operator was trying to obtain information from the victim to help the police "formulate an appropriate response to the situation." (*Id.* at p. 177.)

We see no meaningful difference between the call in *Brenn* and the calls here. For our purposes, they are identical. From the callers' standpoint, each of the calls was made in immediate response to violence, to report what had just occurred. Farrow's ex-wife said she had "just" escaped from his abuse and the 2015 caller said she "just" saw Farrow attacking Doe inside his moving car. And, from the operators' standpoint, each call provided an opportunity to obtain information about where the perpetrators were and how much of a threat they posed. The operator on the 2007 call asked Farrow's ex-wife

8

several questions about his current whereabouts and the operator in the 2015 call also tried to ascertain the caller's whereabouts, whether she saw Farrow's license plate, and which direction he went. In other words, the primary purpose of the calls was to respond to and mitigate an emergency, not to build a case against the perpetrators. We share the sentiments of the court in *Brenn*: "It is hard to construct a definition of the word 'emergency' that [these] scenario[s] do[] not fit." (*Brenn*, *supra*, 152 Cal.App.4th at p. 177.) Farrow argues the calls were not testimonial because they were made "some time after the domestic violence crimes had ended." We disagree. While both calls may have been made a matter of minutes after he had attacked the victims, the emergency was by no means over. In both instances, the abuse had just occurred and Farrow's location was unknown, meaning the threat he posed to the victims, the responding officers, and potentially others was still very much real. "An assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue." (*Michigan v. Bryant*, *supra*, 62 U.S. at p. 363.) As the court aptly observed in *Brenn*, the argument that the emergency was over is "much easier to make from a law office than from 100 feet from someone who has just [attacked] you." (*Brenn*, at p. 177.) "At the time of the call, [the victim] was suffering from a fresh stab wound, appellant was still at large, and it was unclear whether he still had any weapons or was searching for [the victim]." (*Ibid*.) The same is true of the calls here. When they were made, the victims of Farrow's violence were freshly injured, Farrow was not on the

9

scene, and it was unclear what he planned to do next. This is the textbook definition of an emergency.

Finally, Farrow argues the 2007 call was testimonial because the operator asked his ex-wife questions about whether he had been violent towards her before. This argument misunderstands the test for determining whether statements to the police are testimonial. In this context, it is the purpose of the operator's questions that matters, not the answers his ex-wife gave. Like the operator's questions in *Brenn* asking about the defendant's mental health history, the 2007 operator's questions about prior abuse were not intended to build a case against Farrow for some future criminal proceeding but rather to assess how dangerous he was and how serious the emergency. Both 911 calls were clearly nontestimonial, and as a result, we conclude Farrow's confrontation rights were not violated.

B.     *Dueñas*

Relying on *Dueñas*, Farrow argues the trial court erred by failing to hold a hearing on his ability to pay the fees and restitution fine imposed in his case. The People argue that Farrow forfeited his challenge to the restitution fine by failing to object in the trial court and that the imposition of $70 in fees was, in any event, harmless. We agree with the People.

Long before *Dueñas*, Penal Code section 1202.4, the provision governing restitution, authorized courts to consider a defendant's inability to pay when "increasing the amount of the restitution fine in excess of the minimum fine." (Pen. Code, § 1202.4,

10

subd. (c).) Here, the trial court increased Farrow's restitution amount above the minimum ($300) fine, and as a result, Farrow could have made an objection based on his inability to pay the fine. The fact he did not has nothing to do with *Dueñas*.

Farrow points to cases where courts have declined to find forfeiture, but all of those cases involve the statutory minimum restitution fine, and the statute does not authorize a court to take ability to pay into account when imposing the minimum fine. As we explained in *People v. Jones* (2019) 36 Cal.App.5th 1028 (*Jones*), the fact Penal Code section 1202.4 authorizes a court to consider ability to pay *only when going above the statutory minimum* "strongly support[s] the conclusion that," before *Dueñas*, "the trial court had no discretion to take ability to pay into account." (*Jones*, at p. 1032.) Based on that reasoning, we held in *Jones* that any ability-to-pay objection to the minimum fine, before *Dueñas*, would have been futile, and therefore the forfeiture rule should not apply. But that reasoning applies to the minimum fine only and so does not apply in this case.

Turning to the $40 court operations assessment and the $30 conviction assessment, we agree with the People that any error in failing to consider Farrow's ability to pay is harmless. Here, as was also the case in *Jones*, the record demonstrates Farrow will be able to pay the $70 in assessments with prison wages. (*Jones*, *supra*, 36 Cal.App.5th at p. 1035.)

"[E]very able-bodied prisoner" must work while imprisoned. (Pen. Code, § 2700.) Prison wages range from $12 to $56 per month, depending on the job and skill level involved. (Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1).) Fifty percent of Farrow's

11

wages and trust account deposits will be deducted to pay any outstanding restitution fine, plus another 5 percent for the administrative costs of this deduction. (Pen. Code, § 2085.5, subds. (a), (e); Cal. Code Regs., tit. 15, § 3097, subd. (f).) Farrow is 42 years old and, according to the probation report prepared before sentencing, in good health. Even assuming he goes some months without a paid job and earns nothing more than the minimum prison wage when there are jobs available, his 11-year sentence will afford him sufficient time to pay off $70 in assessments. (See *Jones*, *supra*, 36 Cal.App.5th at p. 1035 ["Given that the restitution fine is $300 and the assessments are $70, Jones will have sufficient time to earn these amounts during his sentence, even assuming Jones earns nothing more than the minimum. . . . In our view, this forecloses a meritorious inability to pay argument"].)

## III

## DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH                         
                                    J.

We concur:


McKINSTER            
            Acting P. J.


MENETREZ            
                J.

12