Filed 5/17/22  P. v. Candler CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARQUIS WAYNE CANDLER,<br><br>Defendant and Appellant. | F080373<br><br>(Super. Ct. No. BF176270A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Nieto Tennant, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Marquis Wayne Candler killed Jamore Holliday and wounded Holliday's girlfriend, T.N., after shooting them in the apartment where they all lived.

A Kern County jury convicted defendant of first degree murder of Holliday (Pen. Code, §§ 187, subd. (a), 189, subd. (a))[1] and attempted premeditated murder of T.N. (§§ 664/187, subd. (a)). The trial court sentenced defendant to 188 years to life in prison.

Defendant raises several issues on appeal. First, he claims the trial court erred when it denied his respective motions for mistrial and new trial after the jury mistakenly received an unredacted audio recording and transcript of a jail call between defendant and his brother. Next, defendant claims the trial court erred when it admitted into evidence certain items related to his sister's 911 phone call after the shooting. Additionally, defendant argues the trial court improperly instructed the jury on consciousness of guilt. Defendant also raises a claim of cumulative prejudicial error. Finally, defendant asks us to strike a one-year prior prison term enhancement pursuant to section 667.5, subdivision (b), that the trial court inadvertently imposed.

We will remand the matter for resentencing in light of Senate Bill No. 483 (2021–2022 Reg. Sess.) (Senate Bill 483 or Sen. Bill 483). We affirm the judgment in all other respects.

## FACTUAL BACKGROUND

### THE INCIDENT IN QUESTION

Defendant lived in an apartment in Bakersfield with Holliday and T.N. Defendant and Holliday were close friends.

On the night of April 7, 2019, defendant and Holliday drank together and were having a good time. At some point during the night, defendant spoke with his brother

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

over video call. Defendant appeared intoxicated on the call; his face was puffy and he slurred his words.

In the early morning of April 8, 2019, defendant entered the apartment talking on a cell phone and holding a gun. Defendant's gun made T.N. feel unsafe and she left and went across the street to a convenience store. Holliday met T.N. and they remained there until about 1:00 a.m. They met a homeless woman, M.T., and the three of them returned to the apartment together.

Upon returning, T.N. noticed blood in the apartment, stairwell, and door and she went upstairs to put her purse down. Holliday told defendant to leave the apartment, and an argument ensued between the two.

Defendant went upstairs and fired the gun at T.N. T.N. heard the shot by her right ear and she ran downstairs. T.N. realized she had been shot when she reached the inside of her apartment door.

As she grabbed the door, T.N. heard Holliday say "'Don't kill me. Don't kill me. I just want to live. I just want to live.'" Meanwhile, M.T. witnessed Holliday fall to the ground after being shot. M.T. then saw defendant hover over Holliday and shoot him again. M.T. ran to the bathroom. She heard two more shots.

Louis C. lived across the street from defendant's apartment complex. Louis was sitting in his vehicle at 1:15 a.m. when he heard five or six gunshots. Louis then observed a white vehicle leave the parking lot.

Law enforcement located Holliday in an alley behind the apartment complex. Medical professionals pronounced Holliday dead. T.N. received stitches for a gunshot wound she sustained to her left arm.

At 5:37 a.m., defendant's sister, T.H., called 911. T.H. told the dispatcher defendant showed up at her house very drunk and she overheard defendant discussing shooting two people on the phone. She wanted defendant removed from her house.

3.

Law enforcement arrived at T.H.'s house at 5:55 a.m. Officer Louis noted a white Chrysler with blood smeared on the rear bumper and front seats as he approached. Defendant was taken into custody roughly an hour later.

Detectives interviewed defendant after his arrest. He told the investigating officer that "I just blacked out, man, from drinking fucking a lot of Hennessey." After learning Holliday was dead, defendant stated "me and Jodi ain't fought. I ain't never fought that man a day in my life. We've never fought, never. Not one time have me and that man fought. That's my, like, one of my best friends, man." He denied involvement in the shooting throughout the interview.

*CRIMINAL CHARGES AND TRIAL*

An information charged defendant with (1) first degree premeditated murder of Holliday (§§ 187, subd. (a), 189, subd. (a)); (2) attempted premediated murder of T.N. (§§ 664/187, subd. (a)); and (3) possession of a firearm by a felon (§ 29800, subd. (a)(1)).[2] Among other allegations, the information alleged defendant suffered prior prison convictions within the meaning of section 667.5, subdivision (b).

Prior to trial, the prosecution moved in limine to admit certain 911 calls made during the night of the shooting. Defense counsel objected to the admission of T.H.'s 911 call as testimonial hearsay and violative of the Sixth Amendment's confrontation clause. The court found T.H.'s call admissible pursuant to the spontaneous statement exception to the hearsay rule in Evidence Code section 1240. It also concluded T.H.'s statements were not testimonial in nature and not subject to the Sixth Amendment.

The prosecution case included eyewitness testimony from T.N., M.T., and Louis. Bakersfield Police Officer Ryan Clark testified he entered defendant's apartment after the shooting and recovered a black revolver with "fresh blood" on it and hair around the

---

**2**     The information also charged defendant with the misdemeanor battery of C.K. that occurred the night before the shooting on April 7, 2019. The trial court severed this charge. The record indicates the prosecution dismissed this charge.

cylinder of the firearm.  A criminalist with the Kern County Regional Crime Lab testified she tested two samples of blood taken from the gun and the hair.  Defendant's DNA could not be excluded as a contributor to the samples tested.[3]

The jury also heard T.H.'s 911 call.  In addition, over defendant's hearsay objection, the trial court permitted Officer Rodriguez to testify he responded to T.H.'s address because "[a] female subject had called the police department, stating she overheard her brother, [defendant], on the phone, stating that he had shot and killed someone."  The prosecution also introduced the computer-aided dispatch (CAD) log related to the call, which contained the comment that "Caller says her brother shot two people tonight, and she wants him gone from her house."

Defendant's case featured testimony from Dr. Michael Musacco, who performed a psychological evaluation of defendant at Kern County Jail.  Dr. Musacco opined that defendant partially blacked out at the time of the shooting due to the amount of alcohol he consumed that day.  Defendant's brother, M.C., also testified as to defendant's apparent intoxication before the shooting.  Defense counsel introduced as exhibit No. AAA a portion of the recording of the jail call between defendant and M.C. where defendant stated he did not remember their video call because of how much he drank.  The jury also received a transcript of the call marked as exhibit No. AAA-1.  Both were admitted into evidence.

During deliberations, the jury requested 12 copies of defense exhibit No. H-1—an unredacted transcript of the jail call.  Roughly one hour later, the trial court informed counsel exhibit No. H-1 was never admitted into evidence.  The court explained that

---

[3]     The criminalist testified the DNA profiles of the hair samples were "single-source" and defendant could not be excluded as a contributor to either sample.  One of the blood samples taken from the revolver was a "mixture" and defendant could not be excluded as a contributor to that sample.  Another blood sample taken from the revolver was "single-source" and, again, defendant could not be excluded as a contributor.

exhibits Nos. AAA and AAA-1 were admitted into evidence and were "a very limited part of the original [exhibits Nos.] H and H-1."

Defendant moved for a mistrial arising from this mistake. The court denied defendant's motion without prejudice to file a motion for new trial.

Ultimately, the jury convicted defendant on all counts.

At sentencing, defense counsel moved for a new trial, based in part, on the jury's inadvertent receipt of exhibits Nos. H and H-1. The trial court again denied defendant's motion.

Defendant received the following sentences:

- Count 1 – 75 years to life plus a 25-year enhancement pursuant to section 12022.53, subdivision (d), plus an additional 10 years for two prior serious felony convictions pursuant to section 667, subdivision (a).

- Count 2 – An indeterminate term of 43 years to life pursuant to "[o]ption 3" set forth in the probation report. The trial court added a 25-year enhancement pursuant to section 12022.53, subdivision (d), plus 10 years pursuant to the two prior serious felony convictions pursuant to section 667, subdivision (a).

- Count 3 – The upper term of six years stayed pursuant to section 654.

Relevant for purposes of this appeal, the trial court announced it struck the one-year prior prison term enhancements pursuant to section 667.5, subdivision (b), as to all counts.

Defendant timely filed his notice of appeal.

## ANALYSIS

### I. Denial of Motion for Mistrial and New Trial

Defendant's first issue concerns the jury's inadvertent receipt of exhibits Nos. H and H-1—the unredacted jail call between defendant and M.C. Defendant claims the trial

6.

court abused its discretion when it denied his respective motions for new trial and mistrial because of this mistake. He asks for reversal of his conviction. We decline to do so.

## A. Relevant Factual Background

### 1. Defense Exhibits Nos. H and H-1

Exhibit No. H-1 reads as follows between defendant and his brother, M.C.:

"Automated Recording: After the beep please say United States. (Beep.)

"[Defendant]: United States.

"Automated Recording: Thank you. You have $5.00. This call will cost 31 cents per minute. Plus any applicable federal, state or local taxes. This call is subject to recording and monitoring. If your call is not connected you will be offered the option to leave a voicemail. You may hear silence during the acceptance of the call. Please continue to hold. (Phone ringing.) Hello this is a free call from—

"[Defendant]: It's me.

"Automated Recording: An inmate at Kern County jail. Lerdo Sheriff's Office Central Receiving Facility. This call is subject to recording and monitoring. To accept this free call press 1. To refuse this—thank you for using Securus. You may start the conversation now.

"[Defendant]: Hello?

"[M.C.]: What's up bro?

"[Defendant]: Just sayin' that shit I don't know how long they goin' to have these phones on (unintelligible) they goin' to be cutting these mother fuckers off any minute I'm fucked.

"[M.C.]: Yeah. I'm, uh, I'm, uh, I'm gonna put some more money on that mother fucker I'll fuck my rent 'cause I'll make sure you're straight nigga. I got you bro.

"[Defendant]: Nigga worry about you my nigga. I'm, I'm good nigga (unintelligible—mumbles) I got, uh, I got Sheila doin' what she gonna do. You understand? Focus on yourself my nigga.

"[M.C.]:  Althea—(unintelligible) called too.  She want to talk to you.  She said she don't think it's a good idea to (unintelligible) her car but whatever he say to do that's what we gonna do.

"[Defendant]:  (Unintelligible) you know what I'm sayin'?

"[M.C.]:  Yeah.

"[Defendant]:  She gonna put my shit up for me.  Her mama gave that car or (unintelligible) from her mama you feel me.

"[M.C.]:  Yeah.

"[Defendant]:  It's in good hands.  She, she want it over there at grandpa's house they got too many cars over there.  The got—

"[M.C.]:  Yeah.

"[Defendant]:  —(Unintelligible-overlaps) cars already at grandpa's house.  You know what I'm sayin'?  Grandpa know I love him anyway but that, that's—I ain't worried about that.  I, I, I talked to her briefly earlier I got to call that fuckin' shit—

"[M.C.]:  Yeah.

"[Defendant]:  (Unintelligible-overlaps).

"[M.C.]:  When you go to court?  When you go to court?

"[Defendant]:  I don't—the 23rd  and the 24th for this.  I go—

"[M.C.]:  Yeah.

"[Defendant]:  —on Friday for some other shit though.

"[M.C.]:  That shit she was going to (unintelligible) for?

"[Defendant]:  Yeah.

"[M.C.]:  How's that shit lookin' bro?

"[Defendant]:  The misdemeanor—the misdemeanor shit I go, on, on, on Friday for all the shit I run through and did.  They connected all my felonies.  You know what I'm saying'?  But the other shit I was runnin' fo' with this shit.

"[M.C.]:  Yeah.

"[Defendant]:  I mean it's—

"[M.C.]:  (Unintelligible-overlaps).

"[Defendant]:  It's, it's, it's, it's day by day.  I mean, it, it ain't—it's a case right now bro.

"[M.C.]:  Yeah.

"[Defendant]:  It's all (unintelligible).

"[M.C.]:  Yeah.

"[Defendant]:  You know what I'm sayin'?

"[M.C.]:  Uh-huh.

"[Defendant]:  Can't say too much (unintelligible) they keep a nigga recorded.

"[M.C.]:  I know.

"[Defendant]:  My lawyer already brought tapes to my, my, my— you know what I'm sayin'?  To the—

"[M.C.]:  Yeah that's why I ain't sayin' nothing. That's why I ain't askin' too many questions.  But shit I'm here bro.

"[Defendant]:  Shit.

"[M.C.]:  (Unintelligible) damn.

"[Defendant]:  Baby, baby, baby, baby sister's nigga'.  They got a (unintelligible-overlaps).

"[M.C.]:  I already know.

"[Defendant]:  See what I'm sayin'.  Roy read that shit to me and I was like damn nigger.  I don't know—

"[M.C.]:  Yeah.

"[Defendant]:  —(unintelligible) fuck something (unintelligible)—

9.

"[M.C.]: (Unintelligible) had too many fuckin'—yeah man I was trying to talk to you. I knew you was gone. I—you remember talkin' to me?

"[Defendant]: Hell no.

"[M.C.]: Damn man.

"[Defendant]: (Inaudible).

"[M.C.]: Yeah we was on video chat.

"[Defendant]: That's crazy.

"[M.C.]: Yeah the (unintelligible) sent me—we had the video chat just me, you and [E.] and [M.] It was only four. It was our little group. But they (unintelligible) tellin' me to holler at you. So when I called you you cussed me out and hung the phone up.

"[Defendant]: That's crazy. I don't remember none of that shit.

"[M.C.]: Yeah I—

"[Defendant]: I blacked out nigga. I drunk nigga like—

"[M.C.]: (Chuckles.).

"[Defendant]: —so much nigga. I drunk so much (unintelligible) that day nigga—

"[M.C.]: Alcohol—

"[Defendant]: I didn't have nobody to drink with nigga I was just drinkin' in my own wine and it's just waahhmm. And it (unintelligible).

"[M.C.]: I know.

"[Defendant]: I won't drink that shit again. I, I don't want to drink nothing. I sure damn not drinking any (unintelligible) that shits crazy man.

"[M.C.]: Well—

"[Defendant]: (Unintelligible-overlaps) you got to get you an app man and get an out of town number man. Like Vegas—

"[M.C.]: Alright.

10.

"[Defendant]: —or somethin' and, and it's so cheaper. You know what I'm sayin'? This shit 31 cent a minute now, you know what I'm sayin'? (Unintelligible) like forty, you know, forty something (unintelligible) all that nigga. Nigga—

"[M.C.]: Alright.

"[Defendant]: —(unintelligible-overlaps)—

"[M.C.]: So what I need to get one from Bakersfield?

"[Defendant]: No. Get, get, get a Vegas number. Get an app. Get a Vegas number.

"[M.C.]: A Vegas number?

"[Defendant]: Yeah. It's—

"[M.C.]: Alright.

"[Defendant]: —like I call you in Vegas—you got a Bakersfield number now nigga.

"[M.C.]: Oh yeah I'm trippin'. Damn so you think it would be cheaper to call the Bakersfield—

"[Defendant]: It ain't.

"[M.C.]: —number.

"[Defendant]: It ain't. Trust me.

"[M.C.]: Alright. Alright. I'm here. I'm on it.

"[Defendant]: Yeah and then, uh, shit—I don't know like I said I ain't really—I talked to Thia briefly, uh, I have my own (or home?) girl, you know what I'm sayin' hook me up so I can talk to sis. Talk to her for a little bit.

"[M.C.]: Yeah.

"[Defendant]: I have—yeah.

"[M.C.]: (Sneeze in background.)

11.

"[Defendant]: Yeah nigga just takin' it day by day right now man. See what—

"[M.C.]: All a nigga can do—

"[Defendant]: —(unintelligible-overlaps)

"[M.C.]: —right.

"[Defendant]: On the 24th they goin' to bound my stuff over to Superior Court.

"[M.C.]: Yeah.

"[Defendant]: I'm goin' to have to get a new Preliminary and all that shit. Yeah you know how that big shit go big E. I got two court dates that go back to back. Preliminary and Pre-preliminary. One that—

"[M.C.]: Yeah I know.

"[Defendant]: —(unintelligible) and then—

"[M.C.]: Yeah.

"[Defendant]: —the other one that they just—nigga ain't gonna take no deal period. Nigga is—DA gonna—they gonna bring the cops in the next day and whatever witnesses. Shit. They said my sister a witness and, uh, I guess whoever else got, got hit.

"[M.C.]: Yeah, uh, what was I goin' to say—fuck—oh, uh, May 30th I go to court I can try and I can try and subpoena you. So you can come, you know (unintelligible), if you want.

"[Defendant]: You said what?

"[M.C.]: (Unintelligible-overlaps). I said on the 30th of May I got to go to court but I can subpoena you as one of my witnesses. If you want to come to Riverside. But I don't even know if I'm comin' out there 'cause I'm getting', uh, my lawyer to just appear for me but if you want to come out there then I'll make it happen that way I can come out there so we can at least see each other for a little bit.

"[Defendant]: Nigga I don't even know if I'll have a court date by then. You feel me.

"[M.C.]: Yeah.

"[Defendant]: I'm goin'—after, after—after the 24th nigga I'm going to get re-arraigned on all my charges—

"[M.C.]: (Unintelligible).

"[Defendant]: —again. I don't—

"[M.C.]: Yeah.

"[Defendant]: I don't know what that's going to be in depth. I'm going to have to go through all this shit the Preliminary, the Pre-Preliminary then Motion, Readiness and Trial. You know what I'm sayin'? 'Cause I'm going through a speedy trial.

"[M.C.]: Yeah.

"[Defendant]: I don't even know what (unintelligible-overlaps)—

"[M.C.]: right.

"[Defendant]: —you know what I'm sayin'? I wouldn't mind but shit—you know what I'm sayin'? But nigger doesn't know uhhh—what is uhhh—I don't know what that court date be shooting at me to be honest.

"[M.C.]: Yeah let's just play it by ear. Shit.

"[Defendant]: I got—they just added another charge to my shit.

"[M.C.]: What's kind of charge?

"[Defendant]: Battery. Assault. They said I socked somebody out at the store. Right before—

"[M.C.]: Man.

"[Defendant]: —this shit happened. (Unintelligible) hit him one time though.

"[M.C.]: Yeah.

"[Defendant]: Fucken' but I don't even remember that nigga. I don't remember goin' to the store like that.

"[M.C.]: Yeah.

13.

"[Defendant]: (Unintelligible) at that (unintelligible) man. I stopped—I stopped hangin' out up here—I used to hang (unintelligible) far back you know what I'm sayin'—when I used to be out there and shit. And I stopped hangin' out up here nigga 'cause I, I just removed myself, you know what I'm sayin' to (unintelligible) and shit. (Unintelligible) like man I don't even believe that shit. So I (unintelligible) I'm waiting to see the survivors and shit. But that's just—

"[M.C.]: Yeah.

"[Defendant]: —irrelevant. I'm not even worried about that shit. That's small shit.

"[M.C.]: Yeah.

"[Defendant]: 'Can't do nothin'—(unintelligible) uh, uh, uh, uh assault (unintelligible) shit.

"[M.C.]: Yeah.

"[Defendant]: (Unintelligible-background noise) get over these other humps man. Yan you talk to your siblings—any of your siblings?

"[M.C.]: Naaah I ain't really been talkin' to nobody bro.

"[Defendant]: Oh.

"[M.C.]: I talk to my daughters every day.

"[Defendant]: Uh-huh.

"[M.C.]: I talk to (unintelligible) that's it. I talk to Casey and Cameron every day. I still ain't talked to my son (unintelligible).

"[Defendant]: I don't even know anybody there. I got to get Casey's number see if—

"[M.C.]: Here you got a pen?

"[Defendant]: Yeah, uh, let me pull it out. Yeah.

"[M.C.]: Alright, uh—

"[Defendant]: Huh?

"[M.C.]: Casey is …

14.

"[Defendant]:  Hold on hold on.  Woah, whoa, whoa, whoa, whoa lordy fuckin' numbers written down everywhere.  Okay.

"[M.C.]:  [phone number].

"[Defendant]:  [Number.]  Okay.  You got Tyrone's?

"[M.C.]:  Uh—

"[Defendant]:  Well don't worry about—

"[M.C.]:  Yeah.

"[Defendant]:  —it.  (Unintelligible)—

"[M.C.]:  Yeah I got it.

"[Defendant]:  Unless you know it right now, right now.

"[M.C.]:  Yeah I got it.  I got my, uh, contacts pulled up.  So let me—

"[Defendant]:  Okay.

"[M.C.]:  Let's see, uh, earlier on I don't know what the fuck happened I couldn't access my contacts I was so nervous and just happy to talk to you just so many emotions at once.

"[Defendant]:  Man.

"[M.C.]:  Still man fucked up but I still trying to stay focused and put it together.  I got a new, uh, job lead for this church so back in construction—his— [phone number].

"[Defendant]:  Okay.  Yeah so it's gon—(unintelligible)—

"[M.C.]:  Hey—

"[Defendant]:  'Til, 'til, 'til 'til my girl ain't gonna fucking with me.

"[M.C.]:  Yeah fuck that bitch.  She made me mad.  They called everybody on the video chat.  And then, uh, auntie was doin' most of the talkin' and listening and I erased myself out of the group because that bitch was talkin' about, uh, oh, 'cause they was trying to secure your shit and I was like I'll pay on, um, the storage and what not and she was like he's not getting out something something and this and that just talkin' all negative

15.

'cause that shit happen to (unintelligible) I wanted to cuss that bitch out but I just hung up and erased the—

"[Defendant]: I'm through. I ain't, ain't, ain't, ain't got (unintelligible) negative to say to her bro. I did (unintelligible-background noise) know what I'm sayin'—

"[M.C.]: Yeah I—

"[Defendant]: and shit. She didn't need to do—

"[M.C.]: I

"[Defendant]: —this shit.

"[M.C.]: Yeah, I can't talk to her bro. After she did that to my son and my son ain't talkin' to me. Casey lost her job behind that shit and everything. (Unintelligible).

"[Defendant]: That's, that's just bullshit because I, I, I, I (unintelligible-background noise) that shit's that shit's (unintelligible) what I'm sayin'. I know you think I near knocked down fire from her in the parking lot behind that shit nigga.

"[M.C.]: Yeah man that shit—

"[Defendant]: I had my son they had like (unintelligible) I got get up out of here. I didn't want to go back to the house thinking—not to the house—wanting to go all the way back to Bakersfield. —hey nigger. (Unintelligible)—

"[M.C.]: Yeah.

"[Defendant]: —nigger wasn't—I didn't—I wasn't in the right frame of mind and I didn't—I wanted to make sure my boy was okay.

"[M.C.]: Yes.

"[Defendant]: So I just took him (unintelligible) to my friend (unintelligible) make sure he got calm and chilled him out and—you know what I'm sayin'. Dealt with it 'cause I was done bro I was ready to drive off all the way back to the (unintelligible).

"[M.C.]: Yeah.

"[Defendant]: But I had to do what I had to do it was (unintelligible) for our brother, you know.

"[M.C.]: Uh, you know.

"[Defendant]: But it's goin' to be good my nigger. Nigger goin' to be out—you feel me.

"[M.C.]: Hell yeah.

"[Defendant]: (Unintelligible-background noise) nigger goin' (unintelligible-background noise) you know what I'm sayin'? Go to bed. You know what I'm sayin'.

"[M.C.]: Yeah.

"[Defendant]: No matter (unintelligible-background noise).

"[M.C.]: Nigger I'm about to (unintelligible) ignore that shit.

"Automated Voice: You have one dollar left.

"[Defendant]: (Unintelligible-overlaps) shit.

"[M.C.]: (Unintelligible) nah-uh.

"[Defendant]: Thirty-three—

"[M.C.]: (Unintelligible-overlaps)—

"[Defendant:] —years old.

"[M.C.]: Yeah. You're too old for this bro. (Unintelligible) I'll never drink again in my life (unintelligible)—

"[Defendant]: I am too my nigga. I don't want nothing my nigga (unintelligible) I'm leaving before this shit hangs up man. Uh—

"[M.C.]: I know (unintelligible).

"[Defendant]: —download the app though man. Get everybody on this app—

"[M.C.]: (Unintelligible)

"[Defendant]: —so.

17.

"[M.C.]:  Alright.

"[Defendant]:  (Unintelligible-overlaps).

"[M.C.]:  Everybody need to get a Vegas number?

"[Defendant]:  If Vegas, Texas—

"[M.C.]:  (Unintelligible-overlaps)—

"[Defendant]:  —you know what I'm sayin'.  It just got to be out of California.

"[M.C.]:  Alright I'm on it.

"[Defendant]:  Alright man.

"[M.C.]:  Love you bro.

"[Defendant]:  Keep your head up (unintelligible)—

"[M.C.]:  Yeah you too.  (Unintelligible) for you I'm on it.

"[Defendant]:  Alright bro.

"[M.C.]:  Alright (unintelligible) glad you (unintelligible).

"[Defendant]:  Hey Bulldog Storage.

"[M.C.]:  Alright.

"[Defendant]:  My units .…  Bulldog—

"[M.C.]:  C 74.

"[Defendant]:  —Storage.

"Automated Voice.  Thank you for—

"[M.C.]:  Alright.

"Automated Voice:  —using Securas.

"[M.C.]:  74.

"Automated Voice:  Goodbye."

18.

### 2. Defense Counsel Introduces a Portion of Exhibits Nos. H and H-1 at a Pretrial Hearing

During an Evidence Code section 402 hearing, defense counsel played a roughly one-minute clip of exhibit No. H where defendant and M.C. discussed being on a video call before the shooting and defendant stated he had no memory of the call because he blacked out. Defense counsel informed the court "[t]hat's the limited portion [of exhibit No. H] that defense is requesting to get in." The court deemed the evidence admissible pursuant to Evidence Code section 1250.

### 3. The Court Admits Exhibits Nos. AAA and AAA-1 During the Defense Case

M.C. testified he spoke with defendant a few hours before the shooting and defendant appeared intoxicated. M.C. also testified he spoke with defendant about that call in their subsequent conversation after defendant was taken into custody. Defense counsel then played the portion of the jail call in front of the jury and it was admitted into evidence as exhibit No. AAA. The jury also received a transcript, which was admitted as exhibit No. AAA-1.

Exhibit No. AAA-1 states as follows:

"[M.C.]: Yeah man I was trying to talk to you. I knew you was gone. I—you remember talkin' to me?

"[Defendant]: Hell no.

"[M.C.]: Damn man.

"[Defendant]: (Inaudible).

"[M.C.]: Yeah we was on video chat.

"[Defendant]: That's crazy.

"[M.C.]: Yeah the nieces sent me—we had the video chat just me, you and [A.] and [M.] It was only four. It was our little group. But they hit me and was tellin' me to holler at you. So when I called you you cussed me out and hung the phone up.

"[Defendant]: That's crazy. I don't remember none of that shit.

"[M.C.]: Yeah I—

"[Defendant]: I blacked out nigga. I drunk nigga like—so much nigga. I drunk so much (unintelligible) that day nigga—

"[M.C.]: Alcohol—

"[Defendant]: I didn't have nobody to drink with nigga I was just drinkin' in my own (unintelligible) waaahhmm. And it (unintelligible).

"[M.C.]: I know.

"[Defendant]: I won't drink that shit again. Let alone, I don't want to drink nothing. Damn sure (unintelligible). That shit's crazy man."

### 4. The Jury Inadvertently Receives Exhibits Nos. H and H-1

During deliberations, the jury requested "12 copies of Defendant's exibit [*sic*] H-1." The trial court instructed the bailiff to make the copies as requested.

Shortly thereafter, the trial court notified counsel "of an issue about Exhibit H and H-1 having been admitted." It explained:

"My ruling in favor of the defense was that their motion to admit [exhibits Nos.] H and H-1 would be granted. It was admissible as an exception to the hearsay rule under Evidence Code Section 1250, and the Court would give a limiting instruction to the jury.

"In the People's case in chief, they never sought to admit Exhibits [Nos.] H or H-1.

"On the defense case, when [defense counsel] called [M.C.], the brother of the defendant, she had prepared a redacted version of just a portion of [exhibits Nos.] H and H-1 which was marked as Exhibit [No.] AAA, the audio CD, and Exhibit [No.] AAA-1, the transcript. And that was just a very limited part of the original [exhibits Nos.] H and H-1."

The trial court instructed the bailiff to remove exhibits Nos. H and H-1, place them in an envelope as exhibit No. 4, and seal them.

20.

## 5.     The Trial Court Denies Defendant's Motion for Mistrial

Defense counsel moved for a mistrial on the grounds that exhibits Nos. H and H-1 prejudiced the defense.

The trial court issued an oral tentative ruling denying defendant's motion for the following reasons:

> "There is case law that's very clear that if evidence is erroneously admitted or evidence is placed before the jury that the Court would want to exclude, the Court can admonish the jury that that evidence is stricken, tell the jury that it's not something that you consider or discuss by them in any way. And the case law is quite clear that the Court has the power to do that.

> "I appreciate that there is prejudicial impact from some of the parts of [Exhibit No.] H-1. But the purpose of getting in the evidence about that which ultimately was offered as Exhibit [No.] AAA and [Exhibit No.] AAA-1 was to support the argument that the defendant had no memory of the events that evening, which included no memory of a video chat that he had with his brother and the brother's family. And there is nothing in the Exhibit [No.] H and [Exhibit No.] H-1 that is inconsistent with that. In fact, it is consistent with the defendant having no memory of the events of the evening in question.

> "So I do think that the probative value of that is considerable. And I agree there's prejudicial effect. And if I admonish the jury that I am striking that and explain to them that [Exhibits Nos.] H and H-1 had been considered by the Court and the Court had determined that only a small part of that was relevant and admissible which we then provided to them in [Exhibits Nos.] AAA and AAA-1 and that they are to consider that evidence, AAA and AAA-1, and they are to disregard any evidence that they read or considered or listened to in exhibits [Nos.] H and H-1 so they will understand why they no longer have H and H-1 as they consider the evidence."

Accordingly, the trial court denied defendant's motion.

Thereafter, the trial court instructed the jury:

> "The Court had already—we had already considered them, and they had been marked as [Exhibits Nos.] H and H-1 during our pretrial motion stage. But only a small part of that was relevant and admissible. So that's the only part that the Court was going to allow the jury to consider in evidence. And that is Exhibit[s Nos.] AAA and AAA-1 which you also

21.

had.  [Exhibit No.] AAA-1 is just a one-page transcript which is a very small part of what is contained in [Exhibit No.] H-1.  [Exhibits Nos.] AAA and AAA-1 is the only part that I decided was relevant.  That is the only part that was offered to the jury, and that's all you should have had.  [¶] … [¶]

"… You can understand now that you have to make a conscious effort to set that aside and not consider it.  [¶]  So [Exhibits Nos.] H and H-1 are not in evidence.  You are not to consider that for any purpose.  You are not to discuss it.  It's your duty to make a conscious effort to not let it influence your decision-making in any way.

"You will have exhibits [Nos.] AAA and AAA-1.  That is the only relevant part of that.  It was evidence of a jail call between the defendant and his brother [M.C.]  You will have that in evidence.

"So I am going to confirm that the attorneys and the Court—by not admitting Exhibits [Nos.] H and H-1, I just want to confirm that the attorneys and the Court are not trying to hide evidence or trying to mislead the jury when we don't let certain things into evidence.  It's my duty to make sure that I consider anything that might be evidence and rule on it to make sure it's both relevant and admissible."

### 6.    The Trial Court Denies Defendant's Motion for New Trial

Defendant moved for a new trial, relying, in part, on the jury's receipt of exhibits Nos. H and H-1.  The trial court denied defendant's motion at sentencing.

### A.    Standard of Review

A motion for mistrial "should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction." (*People v. Hines* (1997) 15 Cal.4th 997, 1038.)  """"Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.""" (*People v. Lucero* (2000) 23 Cal.4th 692, 713.)  We review the trial court's denial of a motion for mistrial for abuse of discretion.  (*People v. Ayala* (2000) 23 Cal.4th 225, 282.)

Similarly, we review a trial court's denial of a motion for new trial for abuse of discretion.  (*People v. Rices* (2017) 4 Cal.5th 49, 92.)

22.

### B. Analysis

The California Supreme Court instructs that when a jury mistakenly receives items not in evidence, it is an error in law equivalent to an incorrect evidentiary ruling. (*People v. Anderson* (2018) 5 Cal.5th 372, 420–421 [the trial court did not err in denying motion for new trial based on jury's inadvertent receipt of a letter from the prosecutor to a witness]; see *People v. Gamache* (2010) 48 Cal.4th 347, 395–403 [no reversible error in jury's inadvertent receipt of police interview].) Thus, "[s]uch error is reversible only if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error." (*People v. Cooper* (1991) 53 Cal.3d 771, 836 (*Cooper*); see *People v. Jordan* (2003) 108 Cal.App.4th 349, 363–364 [trial court did not err denying the defendant's motion for new trial after jury inadvertently received police report that disclosed defendant's parole status]; *People v. Rose* (1996) 46 Cal.App.4th 257, 264 [jury's inadvertent receipt of police report was harmless because it was not reasonably probable the defendant would have obtained a more favorable verdict had the jury not received the report].)

In *Cooper*, the jury received a transcript from a separate criminal proceeding against the defendant and defendant moved for mistrial. (*Cooper*, *supra*, 53 Cal.3d at pp. 833–834.) The trial court denied the motion and admonished the jury that the transcript was received into evidence inadvertently and the jury should not consider it. (*Id.* at p. 834.) The Supreme Court observed the exhibit's inadvertent admission "was relatively minor" while crediting the "extremely strong" evidence of the defendant's guilt. (*Id.* at p. 836.) It also noted the trial court's admonishment "further reduc[ed] the danger of prejudice." (*Id.* at p. 838.) Accordingly, the Supreme Court found no abuse of discretion in the denial of the motion for mistrial. (*Id.* at p. 839.)

Similarly, in *People v. Clair* (1992) 2 Cal.4th 629, 667–668 (*Clair*), the defendant claimed the trial court erred when it denied his motion for mistrial after the jury received an unredacted audio and transcript of a conversation between the defendant and a third

person that referenced a separate burglary and assault. (*Id.* at pp. 647, 665.) It characterized the references to these incidents as "insignificant" and "brief and unemphatic," which did not rise to the level of reversible error. (*Id*. at p. 668.)

Finally, in *People v. Jackson* (1996) 13 Cal.4th 1164 (*Jackson*), the jury mistakenly received information that disclosed the defendant was on probation for grand theft auto at the time of his arrest. (*Id.* at p. 1213.) The Supreme Court found it was not reasonably probable the defendant would have obtained a more favorable verdict because the "[p]assing reference to [the defendant's] probationary status and his prior conviction for a nonviolent offense was overshadowed by the considerable evidence against [the] defendant .…" (*Id*. at p. 1214.)

Here, the jury's inadvertent receipt of exhibits Nos. H and H-1 was an error. However, we conclude the error was harmless because of the overwhelming evidence of defendant's guilt. For example, T.N. testified defendant shot her. M.T. witnessed defendant stand over Holliday and shoot him after he had already shot him once. Louis testified he heard five or six gunshots and saw a white car leave defendant's apartment complex. Defendant's blood and hair was found on the murder weapon. In light of this, it is not reasonably probable defendant would have obtained a more favorable verdict had the jury not received exhibits Nos. H and H-1. (*Cooper, supra*, 53 Cal.3d at p 836 [inadvertent receipt of evidence was harmless, in part, because "the evidence established [the] defendant's guilt overwhelmingly"]; *Jackson, supra*, 13 Cal.4th at p. 1214 ["considerable evidence against [the] defendant" rendered inadvertent admission of evidence harmless].) Thus, the trial court did not abuse its discretion when it denied defendant's motion for mistrial and new trial.

Defendant contends the mistake undermined his voluntary intoxication defense. However, as the trial court did, we find nothing in exhibits Nos. H and H-1 to negate this defense. Towards the end of the conversation with his brother, defendant states he did not remember events giving rise to his separate battery and assault charge. Indeed,

defendant acknowledges in his brief that "some support for the blackout scenario can be gleaned from the full transcript." Therefore, exhibits Nos. H and H-1 did not prejudice his voluntary intoxication defense. By extension, defendant does not meet his burden to show reversible error on this ground.

Defendant also claims exhibit No. H-1 exposed the jury to his "pending misdemeanor and felony charges" and another instance where defendant "apparently did violence to a woman." However, a review of exhibit No. H-1 indicates these discussions are "brief" and "insignificant" when compared to the evidence linking defendant to the crimes at issue. (*Clair, supra*, 2 Cal.4th at p. 668.) Moreover, our review of the case law indicates incidental references to prior misconduct does not, by itself, give rise to prejudicial error. (See *Jackson, supra*, 13 Cal.4th at pp. 1213–1214 [inadvertent disclosure of the defendant's probation status was harmless]; *People v. Rose, supra*, 46 Cal.App.4th at pp. 260–261 [jury inadvertently received police report concerning the defendant's videotaping of coworker, but error was harmless]; *People v. Jordan, supra*, 108 Cal.App.4th at pp. 363–364 [inadvertent disclosure of the defendant's parole status deemed not prejudicial error].) Defendant does not direct us to any portion of the record indicating the inadvertent disclosure of this information prejudiced him. This argument fails as well.

In addition, the trial court admonished the jury it should not consider the incompetent evidence. As the People note, "the trial court is permitted to correct an error in admitting improper evidence by ordering it stricken from the record and admonishing the jury to disregard it, and the jury is presumed to obey the instruction." (*People v. Hardy* (1948) 33 Cal.2d 52, 61; see *People v. Allen* (1978) 77 Cal.App.3d 924, 934 ["A jury is presumed to have followed an admonition to disregard improper evidence particularly where there is an absence of bad faith."].)

Defendant, by contrast, characterizes this error as an exceptional case because the jury requested exhibit No. H-1 "late in their deliberations" and made notes on the exhibits. Therefore, defendant claims an admonition could not cure the error.

In *People v. Hardy*, the California Supreme Court noted "'[i]t has also been held that in certain cases where the incompetent evidence goes to the main issue and where the proof of [the] defendant's guilt is not clear and convincing, that the error in admitting the incompetent evidence cannot be cured by striking out and instructing the jury to disregard that evidence.'" (*People v. Hardy*, *supra*, 33 Cal.2d at p. 61.)

This rule is inapplicable here because most of exhibits Nos. H and H-1 did not go to the main issue in this case and does not present a scenario where "the improper subject matter is of such a character that its effect on the minds of the jury cannot be removed by the court's admonitions." (*People v. Seiterle* (1963) 59 Cal.2d 703, 710.) Moreover, as mentioned above, the evidence of defendant's guilt was clear and convincing.

In sum, we conclude the jury's inadvertent receipt of exhibits Nos. H and H-1 was harmless and it is not reasonably probable defendant would have obtained a more favorable verdict in the absence of the mistake. Accordingly, the trial court did not abuse its discretion when it denied defendant's motions for mistrial and new trial.

## II.     Evidence Related to Defendant's Sister's 911 Call Following the Shooting

Defendant's next challenge concerns his sister's 911 call following the shooting. Defendant claims the trial court improperly admitted T.H.'s statements pursuant to Evidence Code section 1240. Defendant also claims it violated the Sixth Amendment's prohibition against testimonial hearsay as set forth in the United States Supreme Court's opinion in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

In connection with this evidence, defendant argues the trial court erred when it (1) permitted Officer Rodriguez to testify he responded to T.H.'s address because "'[a] female subject had called the police department, stating she overheard her brother,

26.

[defendant], on the phone, stating that he had shot and killed someone'"; and (2) admitted the CAD log related to T.H.'s call, which contained the comment "'Caller says her brother shot two people tonight, and she wants him gone from her house.'"

## A.      Relevant Factual Background

### 1.      T.H.'s 911 Call

The prosecution moved in limine to admit 911 calls, including T.H.'s call. The transcript of the call reads as follows:

"CHP DISP: 911 emergency, what are you reporting[?]

"T. H[.]: Hello, yes, um, I have my brother here at my home and I'm just finding out that he just uh, recently just shot two people, and one of them died, and I don't want him here at my house. I need somebody to like send him out.

"CHP DISP: For sure, what's your address.

"T. H[.]: Um, [address].

"CHP DISP: What's his name?

"T. H[.]: Apartment P as in—Oh my god, Marquis Candler.

"CHP DISP: This is P as in Paul?

"T. H[.]: Yes.

"CHP DISP: Is this in Oildale?

"T. H[.]: Yes.

"CHP DISP: Marquis what?

"T. H[.]: Candler.

"CHP DISP: Who did he shoot?

"T. H[.]: Um, to be honest with you, I'm not—I'm not aware of that, okay. He came to my window, knockin', bangin'. He was really, really drunk. Um, I didn't know, he just—(Unintelligible).

"((Crosstalk))

27.

"CHP DISP:  Did he tell you that he did that, or did somebody else tell you he did that?

"T. H[.]:  No, so li-listen, he-he was sittin'—he fell asleep on my couch cuz he was drunk, but he was gettin' phone calls, just briefly he was getting phone calls, and I'm overhearing the conversation and he like, I shot 'em, I shot 'em.

"CHP DISP:  Um-hmm.

"T. H[.]:  And then I'm like, you know, I'm kinda listenin' or whatever and I'm like what the fuck, what's going on.

"CHP DISP:  Um-hmm.

"T. H[.]:  So, instantly I'm scared and then I'm still listening to his conversation and he's like, no he dead, he's like blood dead.  I killed 'em.

"CHP DISP:  Okay.

"T. H[.]:  Like he dead basically, and one of his home girls I guess they confirmed it, like no he's really dead, you didn't just shoot him, he's dead.  So, I got scared and I came over here to my neighbor's house and I'm over here.  He's still at my house right now.  He's (unintelligible).

"CHP DISP:  Is he asleep?

"T. H[.]:  Yeah, he's sleeping.

"CHP DISP:  Okay.

"T. H[.]:  And, I left my door open, Um, cuz I got—I have a daughter and I don't have time for none of this crazy stuff.

"CHP DISP:  Did you see a weapon at all?

"T. H[.]:  No.  No.

"CHP DISP:  Okay hon, what's your name?

"T. H[.]:  Um, T[.H].

"CHP DISP:  Okay.  It's going to be okay.  I'm going to send you some help.  Is he black?  A black male.

"T.[.]:  Yes.

28.

"CHP DISP:  How old is he?

"T. H[.]:  Um, he 3—in his 30's.

"CHP DISP:  In his 30's[?]

"T. H[.]:  Like 31, 32.

"CHP DISP:  Okay, and do you remember what he was wearing when he came over?  What color shirt and pants?

"T. H[.]:  Um, he has like a—he—if I'm not mistaken he has like a burgundy tank top on, um, and I think some gym shorts, but I'm not too sure.

"CHP DISP:  Okay, and he's asleep on your couch?

"T. H[.]:  Yeah, he's—he's knocked out.  He's intox—he's a drunk.

"CHP DISP:  Okay.  Okay, um, can I have—is this your phone number you're calling me from … ?

"T. H[.]:  Yes it is.

"CHP DISP:  Okay.  Alright I'm going to call the uh, sheriff's office and I'm going to let them know okay.

"T. H[.]:  Okay, but when they come, am I gonna have to go back in the house, cuz I don't want him to see me.

"CHP DISP:  [I]s the door open?  Is it unlocked?

"T. H[.]:  Yeah, my door's unlocked.

"CHP DISP:  Okay, what apartment are you in and I'll let them know.

"T. H[.]:  Apartment P.  It's right in the front, so when they pull, I'll like kinda stand outside, cuz my neighbor lives directly across.

"CHP DISP:  Okay.

"T. H[.]:  So, they can know which one to go in.

"CHP DISP:  Okay.  All right and then I want you to stay out of the way, okay.

29.

"T. H[.]: Yeah, for sure.

"CHP DISP: Okay, all right, hold—I'm gonna um, I'm gonna let the Sheriff's Office know okay.

"T. H[.]: Okay, thank you.

"CHP DISP: All right, bye-by[e]."

The court deemed T.H.'s statements admissible under Evidence Code section 1240 because the call "purport[s] to narrate, describe, and explain an event perceived by the declarant and was made spontaneously while the declarant was under the stress and excitement caused by such perception." The court also characterized T.H.'s statements as "made for the primary purpose of meeting an ongoing emergency" and not violative of the *Crawford* rule regarding testimonial hearsay.

### 2. Officer Rodriguez's Testimony Regarding T.H.'s 911 Call

At trial, Officer Rodriguez testified about responding to T.H.'s call and defense counsel posed a hearsay objection. Specifically, the record indicates the following colloquy occurred:

"[PROSECUTOR]: Now, after making contact with [T.N.] at the Fastrip and also with her at the hospital, at some point later in that morning did you arrive or respond to the location of … ?

"[OFFICER RODRIGUEZ]: I did.

"Q: And at or about what time did you respond there?

"A: At about 5:50 in the morning.

"Q: And why did you respond there?

"A: A female subject had called the police department, stating she—

"[DEFENSE COUNSEL]: Objection. Hearsay.

"THE COURT: Is this offered for the limited purpose of explaining conduct?

30.

"[PROSECUTOR]: That's correct.

"THE COURT: I will overrule the objection and tell the jury that the witness is allowed to tell you why he went to that location. It's not for the truth of what he was told but merely for the limited purpose of explaining his conduct. [¶] … [¶]

"[OFFICER RODRIGUEZ]: A female subject had called the police department, stating she overheard her brother, [defendant], on the phone, stating that he had shot and killed someone."

### 3. The CAD Log Related to T.H.'s Call

The People's exhibit No. 29 was a CAD log generated during T.H.'s 911 call.

During trial, defense counsel objected to this evidence because "it's statements that were made by [T.H.] to the dispatcher and the dispatcher then put that information into the CAD log herself." Defense counsel explained the CAD log presented "multiple layers of hearsay."

The trial court ruled it would allow the CAD log but "admonish the jury that the part that's being quoted is not offered for the truth. It's just to be considered as the reason for the CAD log entry, for the limited purpose of the CAD log entry." After the People introduced exhibit No. 29, the trial court instructed the jury "[T]here's some information or some text on this exhibit which I'm allowing for the limited purpose of explaining … why the CAD log entry was made by the dispatcher. So it's not being offered for the truth."

### B. Analysis

The trial court did not err when it admitted T.H.'s call into evidence. However, we conclude the trial erred in overruling defense counsel's hearsay objection to Officer Rodriguez's testimony and in admitting the CAD log into evidence. However, these errors were harmless.

## 1. T.H.'s Statements Made During the 911 Call Were Admissible Pursuant to Evidence Code Section 1240 and Not Testimonial Hearsay

For the reasons discussed below, the trial court correctly admitted T.H.'s call pursuant to Evidence Code section 1240. Moreover, the call was not testimonial hearsay.

### a) Evidence Code Section 1240

Evidence Code section 1240 provides that "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

An admissible statement under Evidence Code section 1240 requires the following: ""'"(1) there must be some occurrence startling enough to produce … nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.'"'" (*People v. Sanchez* (2019) 7 Cal.5th 14, 39 (*Sanchez*).)

"Whether an out-of-court statement meets the statutory requirements for admission as a spontaneous statement is generally a question of fact for the trial court, the determination of which involves an exercise of the court's discretion." (*People v. Merriman* (2014) 60 Cal.4th 1, 65.) On appeal, "[w]e will uphold the trial court's determination of facts when they are supported by substantial evidence and review for abuse of discretion its decision to admit evidence under the spontaneous statement exception." (*Ibid.*)

The trial court did not abuse its discretion when it admitted T.H.'s call as a spontaneous statement and substantial evidence supports its findings. Starting with factor one of Evidence Code section 1240, T.H. explains she just learned her brother shot two

people and killed one of them. Indeed, she called 911 after defendant came to her apartment heavily intoxicated and "knockin' [and] bangin'" at her window. T.H. also explains she "got scared" and left her apartment after learning her brother killed someone.

In addition, T.H. called 911 while she was still overcome with nervous excitement (factor two of Evid. Code, § 1240). She wanted defendant removed from her house. Again, she stated she was scared multiple times to the point where she left her apartment. Indeed, as defendant concedes, T.H. was "upset" when she spoke with the 911 operator. T.H. stated she did not want defendant to "see [her]." She also expressed concern for her daughter. This supports the finding that T.H. was still under duress from learning of her brother's actions. (See *People v. Roberts* (2021) 65 Cal.App.5th 469, 477 [victim's statements fell under spontaneous statement exception where victim seemed "'afraid'" and a "'little bit in shock'"].)

Finally, factor three of Evidence Code section 1240 is clearly met as T.H.'s statements concern learning her brother shot two people and killed one of them. (*Sanchez, supra*, 7 Cal.5th at p. 39 [factor three of Evid. Code, § 1240 met where witness's statements concerned the deaths of his mother and sister].)

Defendant claims the "two or three" hour lapse between T.H. learning defendant shot two people and her call to 911 precludes its admission as a spontaneous statement.[4] Defendant also notes he did not bring a weapon to his sister's apartment or "act[] violently toward her."

---

[4] Defendant cites the record of the preliminary hearing in support of this claim. At the hearing, Bakersfield Police Detective Keegan Gavin testified he spoke with T.H. on the morning of April 8, 2019. Detective Gavin testified T.H. told him defendant arrived at her apartment between 2:00 and 3:00 a.m. According to Detective Gavin, T.H. said she went back to bed after letting defendant in, and then, 15 minutes later, T.H. heard defendant discussing the shootings while on speaker phone.

We find these arguments unconvincing.  While lapse of time is a consideration, our Supreme Court has stated it does not "'deprive[] the statement[] of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance*.'"  (*People v. Poggi* (1998) 45 Cal.3d 306, 319; see *People v. Clark* (2011) 52 Cal.4th 856, 926 [statement from victim "two to seven" hours following attempted murder fell within the scope of Evid. Code, § 1240]; *People v. Brown* (2003) 31 Cal.4th 518, 541 [statements made over two hours after the crime qualified as a spontaneous statement]; see *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1713 [statement by minor made "a day or two" after alleged molestation could qualify as spontaneous utterance].)  Moreover, defendant's assertion that he did not bring a weapon or threaten his sister is irrelevant, as it does not negate the fact that defendant's actions had already placed T.H. in a state of fear that caused her to leave her home and call the police.

In sum, the record indicates the trial court listened to T.H.'s call and found it fell within the scope of Evidence Code section 1240 because T.H. sounded under duress, stated she was scared, and expressed concern for her daughter.  Substantial evidence supports the court's findings.  Accordingly, we conclude the trial court did not abuse its discretion admitting the call under the spontaneous statement exception to the hearsay rule.[5]

### b)  T.H.'s Statements Are Not Testimonial and Do Not Implicate the Sixth Amendment

In *Crawford*, the United States Supreme Court held the Sixth Amendment's confrontation clause bars testimonial hearsay unless the defendant had a prior opportunity to cross-examine the declarant and he or she is unavailable to testify.  (*Crawford, supra*,

---

[5]    We need not address the People's argument that T.H.'s statements were separately admissible under Evidence Code section 1230 because we conclude the trial court properly admitted them under Evidence Code section 1240.

34.

541 U.S. at p. 68.)  On the other hand, in *Davis v. Washington* (2006) 547 U.S. 813

(*Davis*) the United States Supreme Court clarified "nontestimonial" hearsay does not

trigger Sixth Amendment concerns and is subject to ordinary state evidentiary rules.

(*Davis, supra*, at pp. 823–829; see *People v. Cage* (2007) 40 Cal.4th 965, 981 [stating

that *Davis* confirmed "that the confrontation clause is concerned *solely* with hearsay

statements that are testimonial"].)

Relevant for purposes of this appeal, *Davis* provided the following distinction

between testimonial and nontestimonial hearsay statements:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra*, 547 U.S. at p. 822, fn. omitted.)

Additionally, in *People v. Cage*, the California Supreme Court observed from

*Davis*:

> "First, as noted above, the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony.  Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial.  Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation.  Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses.  Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about

past events for possible use at a criminal trial." (*People v. Cage, supra*, 40 Cal.4th at p. 984, fns. omitted.)

A series of Court of Appeal decisions have generally held 911 calls to be nontestimonial in nature and not subject to the Sixth Amendment. (See, e.g. *People v. Corella* (2004) 122 Cal.App.4th 461 (*Corella*); *People v. Brenn* (2007) 152 Cal.App.4th 166 (*Brenn*).) In *Corella*, the defendant's wife called 911 and reported to the operator that the defendant hit her and she repeated the accusation to a police officer and medical personnel who responded to the call. (*Corella, supra*, at p. 464.) She recanted her statements at the preliminary hearing and did not testify at trial. (*Ibid.*) The trial court admitted the wife's statements under Evidence Code section 1240. (*Corella, supra*, at p. 464.)

The Court of Appeal held the wife's statements to the 911 operator were not testimonial under *Crawford* because they were not "'knowingly given in response to structured police questioning,'" and were not like various categories of testimonial statements described in *Crawford*. (*Corella, supra*, 122 Cal.App.4th. at p. 468.) For example, the Court of Appeal noted the defendant's wife initiated the 911 call. (*Ibid.*) Instead, the Court of Appeal characterized the wife's statements as "unstructured" and not resembling formal testimony. (*Id.* at p. 469.)

In *Brenn*, the defendant stabbed the victim in the stomach. (*Brenn, supra*, 152 Cal.App.4th at p. 170.) The victim left the group home, went to another location, called 911, and reported the stabbing. (*Ibid.*) The 911 operator asked the victim who stabbed him and how it happened. (*Id.* at pp. 171–172.) The victim identified the defendant and described the fight in detail. (*Id.* at p. 172.) The trial court ruled the statements were admissible under Evidence Code section 1240 and not barred by *Crawford*. (*Brenn, supra*, at p. 172.)

*Brenn* held the victim's statements to the 911 operator were not testimonial under *Crawford* and *Davis* because "the purpose and form of the statements were not the

functional equivalents of trial testimony." (*Brenn, supra*, 152 Cal.App.4th. at p. 176.) Instead, the victim provided the statements "in response to rapid-fire questioning from the dispatcher." (*Id.* at pp. 176–177.) Additionally, the Court of Appeal noted the dispatcher requested this information to help the victim and responding officers and "not secure a conviction in a court of law." (*Id.* at p. 177.)

Defendant claims T.H.'s statements were testimonial because she was not in danger and she informed the 911 dispatcher defendant was asleep on her couch. Accordingly, defendant claims there was no ongoing emergency.

Applying a de novo standard of review to this issue, we conclude T.H.'s statements were not testimonial and thus do not implicate *Crawford.* (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466 ["On appeal, we independently review whether a statement was testimonial so as to implicate the constitutional right of confrontation."].) T.H. did not call 911 to provide statements for possible use in a criminal trial. (*People v. Cage, supra*, 40 Cal.4th at p. 984.) Rather, as discussed above, she called 911 because she was scared after hearing her brother shot two people and she needed "somebody to like send him out." Said differently, T.H. initiated contact with law enforcement primarily to secure police assistance to remove defendant from her home. (*Davis, supra*, 547 U.S. at p. 822.) She also expressed concern for her daughter's safety and stated that she did not want defendant to see her on the way out—suggesting that she feared her brother. Thus, as with *Corella* and *Brenn*, T.H.'s statements do not bear the indicia of formal trial testimony. Therefore, we reject defendant's confrontation clause argument as well.[6]

---

[6] Because we find no error in the trial court's admission of T.H.'s 911 call, we need not address defendant's argument regarding whether or not the admission of the evidence was harmless.

## 2. The Admission of Officer Rodriguez's Testimony and the CAD Log Did Not Produce Prejudicial Error

We agree with defendant that the trial court erred when it overruled defendant's hearsay objection to Officer Rodriguez's testimony and admitted the CAD log.

With respect to Officer Rodriguez's testimony, the trial court allowed it pursuant to Evidence Code section 1250 "for the limited purpose of explaining" the officer's conduct. However, "this state of mind exception applies only if the declarant's state of mind is relevant to a disputed issue at trial." (*People v. Flores* (2020) 9 Cal.5th 371, 410.) Officer Rodriguez's state of mind was not relevant to the case and so the trial court should have sustained defense counsel's hearsay objection. Thus, we agree with defendant that Officer Rodriguez's testimony should not have been admitted.

With respect to the CAD log, we agree with defense counsel that the comment contained in the log that "[c]aller says her brother shot two people tonight" created "multiple levels" of hearsay. "Statements of others, related by the report writer, are a second level of hearsay. Multiple hearsay may not be admitted unless there is an exception for each level." (*People v. Sanchez* (2016) 63 Cal.4th 665, 675.) The trial court stated it would admit the CAD log with the comment to "explain why the CAD log dispatcher made the entry." Again, this nonhearsay purpose was not relevant to the case. (*People v. Davis* (2005) 36 Cal.4th 510, 535–536 ["Evidence of an out-of-court statement is also admissible if offered for a nonhearsay purpose—that is, for something other than the truth of the matter asserted—and the nonhearsay purpose is relevant to an issue in dispute."].) In addition, because the trial court did not establish an exception to each level of hearsay, the CAD log should not have been admitted. (*People v. Ayers* (2005) 125 Cal.App.4th 988, 995.)

However, these errors were harmless. Both items of evidence were cumulative of T.H.'s statements to the 911 dispatcher and the evidence against defendant was overwhelming for the reasons discussed above. (*People v. Ayers, supra*, 125 Cal.App.4th

at p. 996 [erroneous admission of domestic violence forms nonprejudicial where, among other reasons, the forms were cumulative of victim's statements to police and the evidence against the defendant was overwhelming].) Accordingly, it is not reasonably probable defendant would have obtained a more favorable verdict had the above evidence not been admitted.

## III.    Claimed Instructional Error

Defendant next argues the trial court should not have instructed the jury pursuant to CALCRIM No. 362 (consciousness of guilt) over his objection because there was insufficient evidence to support the instruction.

### A.    Relevant Factual Background

The jury received the following consciousness of guilt instruction:

> "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime, and you may consider it in determining his guilt.

> "If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." (CALCRIM No. 362.)

At closing arguments, the prosecution referenced defendant's recorded interview with police following the shooting (People's exhs. Nos. 27 & 27A) in connection with this jury instruction:

> "The defendant gives a recorded interview. If the defendant makes false or misleading statements before trial, knowing the statement was false or intending to mislead, that conduct may show he is aware of his guilt. And you determine how much weight to place on the defendant's statements.

> "The defendant gave a recorded interview, and I want to go over some of his statements. It starts off pretty small. What is the address? I don't know. Okay. What time did you leave? It was nighttime. Who was there when you were there? Two females and Jody.

39.

"Does it sound like the defendant was having a blackout at this time? He is remembering the events from April 8th.

"What is her name? I don't recall her name. What did she look like? Just a white chick. I don't know her. Again, the officers aren't feeding him information. The officers, didn't tell him that this is a Caucasian female. How else could the defendant have known that unless he remembered it?

"When you left the scene was everything fine? Yes. What about [T.N.]? Was she fine? I don't know why anybody wasn't. Was [T.N.] and Jody fighting at all? They always got their ups and downs. Well, I am specifically talking about last night. Were they fighting at all? They had a little verbal altercation, again, trying to distract and mislead the officers. They didn't have an altercation. He did. [¶] … [¶]

"Well, you're here because we—Jody, do you know what happened to him last night? No. He was shot. And why am I in this shit?

"He is supposed to be Mr. Holliday's friend. [¶] … [¶]

"So have you touched a gun? No. So if we find a gun, right, would there be any reason at all that your gun should be on—your DNA should be on a firearm? No."

Defense counsel objected to giving CALCRIM No. 362 because "in order to give that instruction there needs to be evidence that there was actually something that was false and misleading."

The trial court responded:

"[B]ased on [the prosecution's] representation that he was going to be arguing to the jury that statements that the defendant made to the police were false or misleading, again, I felt it is necessary to give a protective instruction that that's an argument [the prosecution] is making and it's a question of fact for the jury, but if they do find he made false or misleading statements that can't prove guilt by itself. Again, I felt this was a necessary instruction."

## B.    Analysis

An instruction pursuant to CALCRIM No. 362 is appropriate where there is some evidence, if believed by the jury, that defendant knowingly made a false or misleading statement regarding the charged crime that may show he or she was aware of his or her

guilt for the crime.  (*People v. Rankin* (1992) 9 Cal.App.4th 430, 435–436 [discussing CALJIC No. 2.03[7]].)  The California Supreme Court states "there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference" of consciousness of guilt.  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102–103 [discussing CALJIC Nos. 2.04 and 2.06]; see *People v. Bowman* (2011) 202 Cal.App.4th 353, 366 ["A trial court properly gives consciousness of guilt instructions where there is some evidence in the record that, if believed by the jury, would sufficiently support the inference suggested in the instructions."].)  The falsity of defendant's statements may be shown by prosecution evidence, including defendant's pretrial statements.  (*People v. Kimble* (1988) 44 Cal.3d 480, 496–499; *People v. Edwards* (1992) 8 Cal.App.4th 1092, 1103.)

The Third Appellate District's opinion in *People v. McGowan* exemplifies the circumstances when a CALCRIM No. 362 instruction is warranted.  There, the defendant unlawfully sexually penetrated the victim after a party he hosted at his house.  (*People v. McGowan, supra*, 160 Cal.App.4th at pp. 1101–1102.)  When questioned by police, the defendant denied the victim was ever in his house and that he was ever alone with the victim—both of which he later admitted.  (*Id*. at p. 1102.)  On appeal, the Third District rejected the defendant's claim that the trial court erred in instructing the jury pursuant to CALCRIM No. 362.  (*People v. McGowan, supra*, at pp. 1103–1104.)  Instead, the Court of Appeal observed "[t]he trial court properly left it for the jury to determine whether [the] defendant's statement to police was false or deliberately misleading, and if so, what weight should be given to that evidence."  (*Id*. at p. 1104.)

Here, the evidence was sufficient to justify the instruction.  During his police interview, defendant claimed he blacked out, but also recalled seeing Holliday "on and

---

**7**      CALCRIM No. 362 is the successor to CALJIC No. 2.03.  (*People v. McGowan* (2008) 160 Cal.App.4th 1099, 1103.)

off" before the shooting. He recalled that two females—including a "white chick" were in the apartment. He told officers he went to his sister's apartment after leaving Holliday's apartment. In sum, defendant's apparent recollection of key facts undermines his statement to the police he blacked out on the night of the shooting.

Moreover, defendant repeatedly denied any involvement in the shooting during his interview, but witness testimony from T.N. and M.T. identified defendant as the shooter. In addition, the evidence (from T.H.'s call to 911) that defendant was on the phone discussing the shooting prior to his arrest further supports the inference that defendant knew he shot Holliday when police interviewed him. Accordingly, the evidence was sufficient to justify an instruction pursuant to CALCRIM No. 362.

Even if the trial court erred, it was not prejudicial. The California Supreme Court states consciousness of guilt instructions "benefit the defense" because they clarify "'such activity [is] not of itself sufficient to prove a defendant's guilt, and allow[s] the jury to determine the weight and significance assigned to such behavior.'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 908 [discussing CALJIC No. 2.03], quoting *Jackson, supra*, 13 Cal.4th at p. 1224.) Indeed, the trial court responded to defense counsel's objection by stating it felt a "protective instruction" necessary to explain to the jury that defendant's false statements made to police were not sufficient to find him guilty. In light of the conditional and permissive nature of the instruction, we cannot conclude it is reasonably probable defendant would have obtained a more favorable verdict had the trial court not instructed the jury pursuant to CALCRIM No. 362. (*People v. Rankin, supra*, 9 Cal.App.4th at p. 436 [concluding erroneous instruction pursuant to CALJIC No. 2.03 was harmless].)

## IV.    Cumulative Error

Defendant claims the denial of his motion for mistrial, admission of T.H.'s 911 call, and the consciousness of guilt instruction produced cumulatively prejudicial error. He asks us to reverse the judgment on this additional ground.  We reject this argument.

"Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) Said differently, "'[a] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.'" (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) "Although a defendant is entitled to a fair trial, he or she is not entitled to a 'perfect one.'" (*People v. Capers, supra*, at p. 1017.)

Defendant claims the errors "completely undermined [his] defense of voluntary intoxication."  However, defendant does not direct us to any portion of the record that leads us to the conclusion defendant was deprived of due process and a fair trial.  As discussed above, if anything, the error with respect to exhibits Nos. H and H-1 provided support for defendant's blackout scenario.  The same is true regarding T.H.'s 911 call (though we find no error in its admission in the first instance).  And the consciousness of guilt instruction did not impede defendant's evidence in support of his intoxication defense (though, again, we find no error here).  In addition, we emphasize the evidence against defendant was overwhelming, which further undermines defendant's claim of cumulative error.  (*People v. Capers, supra*, 7 Cal.5th at p. 1018 [rejecting cumulative error claim, in part, because "the jury heard overwhelming evidence of [the] defendant's guilt"].)  Therefore, we reject defendant's cumulative error argument.

43.

## V.     Defendant is Entitled to Resentencing

Finally, defendant asks us to strike the one-year prior prison term enhancement the trial court mistakenly imposed on his sentence for attempted premeditated murder of T.N. (count 2).  The People agree defendant is entitled to this relief.

At sentencing, the trial court expressed its intention to strike the section 667.5, subdivision (b), enhancements with respect to counts 1, 2, and 3.  However, it appears defendant's 43-year-to-life sentence on count 2 inadvertently includes the one-year enhancement.  In choosing this sentence, the trial court adopted the sentencing option set forth in defendant's probation report that calculated defendant's sentence as follows: (1) seven years for the offense; (2) plus a 25-year-to-life enhancement pursuant to section 12022.53, subdivision (d); plus two prior serious felony enhancements pursuant to section 667, subdivision (a); plus a one-year prior prison term enhancement pursuant to section 667.5, subdivision (b).

Via Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill 136), the Legislature amended section 667.5, subdivision (b), to apply a one-year enhancement only if "a defendant served a prior prison term for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b)." (*People v. Gastelum* (2020) 45 Cal.App.5th 757, 772.)  Pursuant to the *Estrada*[8] rule, Senate Bill 136 "applies retroactively to all cases not yet final as of its January 1, 2020, effective date." (*People v. Jennings* (2019) 42 Cal.App.5th 664, 682, citing *In re Estrada* (1965) 63 Cal.2d 740, 742, 744–745.)

Moreover, Senate Bill 483 became effective January 1, 2022.  (Stats. 2021, ch. 728, § 1).  In Senate Bill 483, the Legislature declared its intent "to retroactively apply … Senate Bill 136 … to all persons currently serving a term of incarceration in jail

---

[8]     Under *Estrada*, a presumption exists that "statutory amendments that reduce the punishment for a crime … apply retroactively in cases where the judgment is not final on the statute's operative date." (*People v. Barton* (2020) 52 Cal.App.5th 1145, 1152.)

or prison for [the section 667.5, subdivision (b)] enhancement[].”  (Legis. Counsel’s Dig., Sen. Bill 483, Stats. 2021, ch. 728, § 1, p. 2.)  The bill adds section 1171.1, subdivision (a), to the Penal Code and states “[a]ny sentence enhancement that was imposed prior to January 1, 2020 pursuant to subdivision (b) of section 667.5 [except for sexually violent offenses] is legally invalid.”  (Legis. Counsel’s Dig., Sen. Bill 483, *supra*, § 3, pp. 3–4.)  It calls for resentencing for a defendant whose sentence includes the now legally invalid enhancement.  (*Ibid*.)  Furthermore, resentencing cannot result in a longer sentence than the one originally imposed.  (*Ibid*.)  The parties may waive a resentencing hearing.  (*Ibid*.)

Defendant’s prior prison term enhancement was based on a conviction for making a criminal threat (§ 422).  It is not a “‘[s]exually violent offense’” within the meaning of Welfare and Institutions Code section 6600, subdivision (b).  The judgment is not yet final because defendant’s case is presently before us.  (*People v. Jennings, supra*, 42 Cal.App.5th at p. 682.)  Therefore, defendant’s 43-year-to-life sentence should be reduced to 42 years to life and defendant is entitled to resentencing.[9]

---

[9]    We also note the trial court imposed the upper term on count 3 (possession of a firearm by a felon/§ 29800, subd. (a)(1)) and stayed it pursuant to section 654.  Senate Bill No. 567 (2021–2022 Reg. Sess.) became effective January 1, 2022, and amends section 1170 to make the middle term the presumptive sentence for a term of imprisonment unless certain circumstances exist.  (Legis. Counsel’s Dig., Sen. Bill No. 567, Stats. 2021, ch. 731, § 1.3, pp. 25–33.)  As defendant is already entitled to resentencing for the reasons discussed above, we see no reason why defendant should be precluded from raising this issue as well.

## DISPOSITION

This matter is remanded to the trial court for resentencing pursuant to Senate Bill 483.  In all other respects, the judgment is affirmed.

MEEHAN, J.

WE CONCUR:


DETJEN, Acting P. J.


FRANSON, J.

46.